MODIFIED OPINION ON REHEARING
GRIFFIS, P.J.,
for the Court:
¶ 1. The motion for rehearing is denied. The Court’s original opinion is withdrawn, *456 and this opinion is substituted in lieu thereof.
¶ 2. This case considers whether the trial court properly dismissed, under Mississippi Rule of Civil Procedure 12(b)(6), the claims made by an excess insurance carrier against the law firm that was hired to defend the insured. This is a case of first impression in Mississippi.
STANDARD OF REVIEW
¶ 3. In an appeal of a dismissal of a case under Rule 12(b)(6), we apply a de novo standard of review. Ralph Walker, Inc. v. Gallagher, 926 So.2d 890, 893 (¶ 3) (Miss.2006). This Court is “not required to defer to the trial court’s judgment or ruling.” Id. at (¶ 5). “A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint.” Rose v. Tullos, 994 So.2d 734, 787 (¶ 11) (Miss.2008). “[T]he allegations in the complaint must be taken as true[,] and the motion should not be granted unless it appears beyond reasonable doubt that the plaintiff will be unable to prove any set of facts in support of her claim.” State v. Bayer Corp., 32 So.3d 496, 502 (¶ 21) (Miss.2010).
FACTS[1]
A. The Insurance Policies
¶ 4. Shady Lawn Nursing Home and Vicksburg Convalescent Home (collectively, “Shady Lawn”)[2] purchased a Commercial General Liability policy and a Resident Health Care Facility Professional Policy (the “primary policy”) from Royal Indemnity Company (“Royal”).[3] The primary policy limited coverage to $1,000,000 per occurrence and $3,000,000 in the aggregate.
¶ 5. Shady Lawn also purchased an Umbrella Liability Policy (the “excess policy”) from Great American E & S Insurance Services Inc. (“Great American”).[4] The excess policy provided coverage of $8,000,000 per occurrence and $16,000,000 in the aggregate. The excess policy provided that it would not be implicated until the primary policy was exhausted for each claim.
B. The Underlying Lawsuits
¶ 6. On August 29, 2002, a lawsuit styled, The Estate of Huldah Chase, et al. v. International Healthcare Properties, et al., Civil Action No. 02-0133CI, was filed in the Circuit Court of Warren County, Mississippi (the “Chase lawsuit”). The Chase lawsuit alleged that Huldah Chase, a patient at Shady Lawn, received inadequate and negligent care while a resident at Shady Lawn and sought to recover damages.
¶ 7. The Chase lawsuit implicated coverage under both policies. Royal, as the primary insurance carrier, hired defense counsel to defend Shady Lawn, its insured. Great American was notified of the lawsuit, but it did not have a contractual duty *457 to defend Shady Lawn until the Royal policy limits were exhausted. Great American was to be informed of the status of the case until it was resolved.
¶ 8. Great American requested evaluations and assessments of the claim from defense counsel. The defense counsel Royal had retained to defend Shady Lawn provided Great American with status reports. The status reports opined that the settlement value of the case was between $150,000 and $400,000, based on the initial evaluation of the nursing home’s chart and medical records. The reports also stated that experts needed to be designated and that a physician expert had been contacted, but no experts had been retained.
¶ 9. In November 2003, Royal reassigned the defense of the Chase lawsuit to the law firm of Quintairos, Prieto, Wood & Boyer P.A. (“Quintairos”). At that time, a scheduling order was in place that set the deadline for designation of the defendant’s experts for December 15, 2008. In November, the plaintiff designated two expert witnesses; one expert was a physician. The designation included an expert report on how the negligent care of Chase had caused her injuries and death. Quintairos did not designate experts prior to the deadline for the defendant to designate an expert witness.
¶ 10. In January 2004, Quintairos sent a status report to Royal on the Chase lawsuit, which stated that experts had not been retained but that a physician expert would be necessary to offer expert testimony as to the cause of the medical conditions, injuries, and death. The report stated, “based on known facts, this case could have the value of $250,000 in compensatory damages. If punitive damages are rewarded, the case value would be significantly higher. However, at this time[,] there does not seem to be a basis for awarding of damages.... At this time, the trial value of this case is approximately $500,000.”
¶ 11. Shady Lawn began to write Royal to express its concern with Quintairos and Quintairos’s defense of the case. Shady Lawn noted its concern that none of Quin-tairos’s partners or trial attorneys were licensed to practice law in Mississippi. Royal determined that Quintairos was its choice of defense counsel, and Quintairos would appropriately defend the Chase lawsuit.
¶ 12. In February 2004, Quintairos attempted to designate a physician as an expert witness. The designation was offered to rebut the plaintiffs expert witness’s opinion as to causation, injuries, damages, and death. The plaintiff filed a motion to strike the late designation of an expert witness. On March 18, 2004, the trial court granted the motion and struck the designation of Shady Lawn’s expert witness. As a result, Shady Lawn would not be able to offer expert witness testimony at the trial of the Chase lawsuit.
¶ 13. The next day, on March 19, 2004, Quintairos sent an “updated lawsuit evaluation” and increased the settlement value of the case from a maximum of $500,000 to a range of $3,000,000 to $4,000,000. This was the first indication Great American received that its excess policy may be necessary to satisfy the claims alleged in the Chase lawsuit. Great American immediately retained counsel to protect its interests and the interests of the insureds.
¶ 14. Just two days earlier, on March 17, 2004, Great American had learned that Quintairos had not retained local counsel and that none of the Quintairos partners or trial attorneys had been admitted to practice law in Mississippi. Thus, Royal had hired no attorneys who could represent the insureds at the trial of the Chase lawsuit.
*458 ¶ 15. Upon receipt of the March 19th evaluation, Royal immediately tendered the limits of its policy. Great American’s excess policy became responsible for any verdict returned. Thereafter, Great American settled the Chase lawsuit for a significant sum, which was not disclosed in the amended complaint.
¶ 16. In addition to the Chase lawsuit, there were three other cases where Royal hired Quintamos to defend Shady Lawn. Great American alleged that it was damaged by Quintairos’s mishandling of each of these cases.
C. The Instant Lawsuit
¶ 17. On November 15, 2006, Great American filed its complaint and commenced this litigation. The complaint was amended, and the proper parties were substituted. In the amended complaint, Great American asserted claims against Royal[5] and Quintamos. The claims against Quin-tamos are for equitable subrogation, legal malpractice, negligence, gross negligence, negligent misrepresentation, and negligent supervision.
¶ 18. On September 2, 2008, Quintarnos filed a motion to dismiss under Mississippi Rule of Civil Procedure 12(b)(6). The motion asserted that the amended complaint failed to state a claim against Quintamos upon which relief can be granted. The motion further argued that Great American cannot prevail on any of the claims asserted against Quintamos, and it is entitled to no relief under any set of facts that could be proved in support of its claims. Quintamos argued that Great American lacked standing to file suit because there was no attorney-client relationship between Great American and Quintamos.
¶ 19. On May 28, 2009, the trial court granted Quintairos’s motion. In the order, the trial court ruled:
[Quintamos] sets forth that it was hired by the primary insurance carrier, Royal Indemnity Company, to represent the insured in the underlying litigation and that Plaintiff, Great American E & S Insurance Company, as excess insurer, has no standing to assert a cause of action for malpractice against it. Numerous authorities of law have been cited[,] and the parties at the hearing acknowledged that the matter is unsettled in Mississippi [l]aw and that it is a matter of first impression for Mississippi [c]ourts. The Court has reviewed the authorities and public policy considerations set forth in the briefs as to whether Mississippi [l]aw should chart a course one way or the other. This Court concludes that because of the different interest and goals of the primary carrier and excess carrier particularly as to varying risks of recovery with potential damages, it is unwise to require the same counsel to be responsible and liable to both at the same time. To do so would put counsel in a conflict of loyalty and interest. Therefore, the Court declines to extend the doctrine of equitable subrogation and legal malpractice, negligence, gross negligence[,] and negligent misrepresentation to claims of an excess carrier against counsel hired by the primary carrier.
¶ 20. On May 29, 2009, the trial court entered a “Final Order of Dismissal” and found that the previous order “concluded [that] the claims only related to this party, and there are other remaining claims in the case[;] there is no just reason for delay in entering a final order as to the claims *459 against Quintairos.... ” Thus, the court certified the final judgment as final under Mississippi Rule of Civil Procedure 54(b).[6]
¶21. Great American timely filed its notice of appeal.
DISCUSSION
¶22. Great American has divided its argument between the negligence claims and the equitable subrogation claim. Great American argues that the facts alleged in the amended complaint were legally sufficient to survive a Rule 12(b)(6) motion. We agree.
A. Negligence Claims
¶ 23. Great American asserted five negligence claims against Quintairos. The claims were for legal malpractice, negligence, gross negligence, negligent misrepresentation, and negligent supervision. We consider these claims in three separate categories: negligent misrepresentation, legal malpractice, and negligence.
1. Negligent Misrepresentation
¶ 24. To support its claim for negligent misrepresentation, Great American asserted that: Quintairos made misrepresentations or material omissions to Great American about the Chase lawsuit and the other lawsuits; the misrepresentations and omissions were material and significant; Quintairos failed to exercise reasonable care in making the misrepresentations or omissions; Quintairos intended for Great American to rely and act upon the misrepresentations or omissions; Great American was justified in relying upon the statements and did in fact reasonably rely upon Quintairos’s statements; and Great American incurred damages as a proximate result thereof. The amended complaint stated each of the necessary elements of the claim for negligent misrepresentation. See Hazlehurst Lumber Co., Inc. v. Miss. Forestry Comm’n, 983 So.2d 309, 313 (¶ 11) (Miss.2008).
¶ 25. The facts alleged in the amended complaint establish, for the purpose of a Rule 12(b)(6) motion, that Great American had requested and was provided status reports on the litigation. The status reports, provided to Great American, indicated the settlement value of the Chase lawsuit as between $150,000 to $500,000, well below the threshold necessary to involve Great American’s excess policy. However, after the trial court struck the expert-witness designation in March 2004, Quin-tairos increased the settlement value of the case from a maximum of $500,000 to a range of $3,000,000 to $4,000,000. Thus, Great American claims: Quintairos had falsely represented that the settlement value of the cases was worth substantially less than the amount that would implicate Great American’s coverage; Great American relied on the false representations; *460 Great American had no reason to take action to protect itself; and Great American was damaged as a result of the misrepresentations.
¶ 26. Accordingly, this Court finds that there is a set of a set of facts that would entitle Great American to relief. Therefore, as to Great American’s claim for negligent misrepresentation, this Court finds that the Rule 12(b)(6) motion should have been denied. Accordingly, the trial court’s judgment is reversed, and this case is remanded for further proceedings.[7]
2. Legal Malpractice
¶27. Great American also asserted a claim for legal malpractice. Great American alleged that Quintarnos failed to exercise the degree of care, skill, knowledge, and ability ordinarily possessed by members of the legal profession in its performance of work in the Chase lawsuit and the other lawsuits. Great American claimed that it was damaged as a proximate result thereof.
¶ 28. The elements of a legal-malpractice claim require: (1) an attorney-client relationship, (2) “negligence on the part of the lawyer in handling his client’s affairs entrusted to him,” and (8) “proximate cause of the injury.” Byrd v. Bowie, 933 So.2d 899, 904 (¶ 15) (Miss.2006). In this section, we consider the first element—were there sufficient facts pleaded in the amended complaint to support the finding of an attorney-client relationship. Said differently, does the amended complaint allege any set of facts upon which Great American could establish that it had an attorney-client relationship with Quin-tairos?
¶ 29. Quintarnos argues that it was hired by Royal to defend Shady Lawn. There was no direct contractual relationship between Quintamos and Great American. Great American argues that it may pursue a claim of malpractice despite the absence of a direct attorney-client relationship because it had detrimentally relied on Quintairos’s representation of Shady Lawn.
¶ 30. In Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay, 42 So.3d 474, 485 (¶ 30) (Miss.2010), the Mississippi Supreme Court ruled:
An attorney-client relationship exists when:
(1) A person manifests to a lawyer the person’s intent that the lawyer provide legal services for the person; and
(2)(a) The lawyer manifests to the person consent to do so, or (b) fails to manifest lack of consent to do so, knowing that the person reasonably relies on the lawyer to provide the services, or (c) a tribunal with power to do so appoints the lawyer to provide the services.
Singleton v. Stegall, 580 So.2d 1242, 1244 n. 2 (Miss.1991) (citation omitted). As such, fee payment by the client to the attorney is not required. See id. at 1244.
¶ 31. Based on this definition, the amended complaint alleged sufficient facts to establish that an attorney-client relationship existed between (a) Shady Lawn (the insured) and Quintamos and (b) Royal and Quintamos. We must determine whether the facts could prove that there was an attorney-client relationship between Great American and Quintamos.
*461 ¶ 32. Quintairos argues that “allowing a stranger to the attorney-client relationship to pursue a legal malpractice claim will present serious confidentiality issues.” (Emphasis added). Indeed, this is the deciding issue — were there sufficient facts pleaded for the trial court to find that Great American was not a “stranger” to the attorney-client relationship. Following Seay, we must consider the allegations of the complaint to determine whether “(1) [Great American] manifests to [Quintairos] [Great American’s intent that [Quintairos] provide legal services for [Great American]; and (2)(a) [Quintairos] manifests to [Great American] consent to do so, or (b) fails to manifest lack of consent to do so, knowing that [Great American] reasonably relies on [Quintairos] to provide the services.” Seay, 42 So.3d at 485 (¶ 30).
¶33. Quintairos notes that all Mississippi attorneys have a statutory duty “[t]o maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients.” Miss.Code Ann. § 73-3-37(4) (Rev.2008). The amended complaint claims that Quintairos, or the prior defense counsel, provided status reports or “evaluations” of “the settlement value” of the Chase lawsuit. If, indeed, the evidence at trial establishes that defense counsel, hired by Royal to represent a mutual insured, gave information to Great American that was confidential information and was protected from disclosure by the attorney-client privilege or the statute, then such may be considered to be legally sufficient evidence to establish an attorney-client relationship, at least to pass Rule 12(b)(6) muster.
¶ 34. We conclude that if Great American was provided defense counsel’s evaluation of the “settlement value” of the plaintiffs lawsuit, as is alleged in Great American’s amended complaint, such information would appear to be considered the rendition of professional legal services by a lawyer. See M.R.E. 502(a)(1). Certainly, the provision of the “settlement value” of a case to an excess carrier, by defense counsel, could be considered a “confidential communication”[8] because it was “intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.” M.R.E. 502(a)(5). The privilege for this communication could not possibly be considered “privileged” unless Great American was considered to be a “client” or a “representative of the client.” M.R.E. 502(b). In Seay, the supreme court reasoned: “This Court has stated that ‘a lawyer has a duty to inform his client of all matters of reasonable importance related to the representation or arising therefrom.’” Seay, 42 So.3d at 487 (¶ 36) (citing Tyson v. Moore, 613 So.2d 817, 827 (Miss.1992)). Therefore, we find that the allegation in the amended complaint that defense counsel, including Quintairos provided attorney-client privileged communications to Great American may provide a set of *462 facts upon which Great American may be able to prove that an attorney-client relationship existed.
¶ 85. Great American also argues that privity of contract is not a necessary element of a legal-malpractice claim. Century 21 Deep S. Props., Ltd. v. Corson, 612 So.2d 359, 873 (Miss.1992). In Corson, James and Lucy Corson sued , several defendants over a real-estate transaction. In one claim, the Corsons sued Donald J. Steighner, an attorney, for legal malpractice. The supreme court stated that “a legal malpractice action requires an attorney-client relationship.” Id. at 372 (citing Singleton, 580 So.2d at 1244; Hickox v. Holleman, 502 So.2d 626, 633 (Miss.1987) (overruled on other grounds); Hutchinson v. Smith, 417 So.2d 926, 927 (Miss.1982)). The Corsons did not allege that they had a direct attorney-client relationship with Steighner. Id. Instead, the Corsons relied on a statute that “abolished the necessity of privity in ‘all causes of action for economic loss brought on account of negligence,’ and claim reliance on Steighner’s title opinion.” Id. (quoting Miss.Code Ann. § 11-7-20 (Supp.1990)). The supreme court then concluded:
Our case law regarding legal malpractice is, to the extent that privity is required, in conflict with Miss.Code Ann. § 11-7-20 unless there is a distinction between garden variety negligence cases and actions for legal malpractice. The elements of negligence are duty, breach, proximate cause, and damages. Lyle v. Mladinich, 584 So.2d at 398-99. The elements of legal malpractice are attorney-client relationship (which imposes a duty), negligence (breach), proximate cause, and damages. Hickox, 502 So.2d at 633. At most, a legal malpractice action is a negligence action dressed in its Sunday best.
Corson, 612 So.2d at 373. The supreme court held:
[w]e modify the requirements of legal malpractice actions based on an attorney’s negligence in performing title work by abolishing the requirement of attorney-client relationship and extending liability to foreseeable third parties who detrimentally rely, as we have done in cases involving other professions. An attorney performing title work will be liable to reasonably foreseeable persons who, for a proper business purpose, detrimentally rely on the attorney’s title work, suffering loss proximately caused by his negligence.
Id. at 374 (emphasis added).
¶ 36. The supreme court in Corson did not require a direct attorney-client relationship or privity of contract. Instead, the court found that “the presence or absence of an attorney-client relationship is merely one factor to consider in determining the duty owed rather than being the single factor which establishes that a duty is owed.” Id. at 373. The question then becomes: “to whom is a duty owed?” Id. Thus, based on Corson, it appears that the conclusion could be changed to read — “an attorney performing [insurance-defense] work will be liable to reasonably foreseeable persons who, for a proper business purpose, detrimentally rely on the attorney’s [insurance-defense] work, suffering loss proximately caused by his negligence.” Id. Indeed, Great American appears to be in a situation similar to the Corsons.
¶ 37. Quintairos argues that the extension of Corson to excess insurance carriers would be against public policy. Specifically, Quintairos contends that such a claim would undermine the attorney-client privilege enjoyed by the insured. At this time, in our consideration of a Rule 12(b)(6) motion and in a case of first impression, we reject this argument. We recognize *463 that if Shady Lawn, the insured, did not have the good business sense to purchase the excess policy, then Shady Lawn would have been responsible for paying the amounts necessary to settle the Chase lawsuit once the Royal policy was exhausted. Cf. Hartford Ace. & Indem. Co. v. Foster, 528 So.2d 255 (Miss.1988). Great American did not come to be involved in this litigation out of the goodness of its corporate heart. Great American is involved only because Shady Lawn purchased an excess policy with Great American. The existence of the excess policy is simply an extension of the insured.
¶ 38. Quintamos also claims that denying Great American the right to file a claim would not leave it without a remedy in this case because it had the option of protecting its interests by hiring its own attorney. We reject this argument as well. We recognize that the orderly defense of an insured often, if not always, requires that defense counsel be singularly focused on the insured’s interest. Allowing or expecting excess carriers to enter an appearance in defense of an insured, and have their own interests in mind, would not lead to the orderly and efficient resolution of each case with the required focus on the insured’s interest. Cf. id.
¶ 39. In American Centennial Ins. Co. v. Canal Insurance Co., 843 S.W.2d 480, 484-85 (Tex.1992), the Texas Supreme Court explained:
[T]he concerns of the excess and primary carriers and the insured generally overlap in ensuring that the merits of the defense are not precluded from being heard because of attorney malpractice. “The best interests of both insurer and insured converge in expectations of competent representation.” Atlanta Int’l Ins. Co. v. Bell, 438 Mich. 512, 475 N.W.2d 294, 298 (1991). While in some circumstances these interests may diverge, presenting a different situation, here the excess insurers do not predicate liability on tactical decisions by trial counsel implicating conflicting interests between the insured and the insurer.
[[Image here]]
No new or additional burdens are imposed on the attorney, who already has the duty to represent the insured.... If the asserted malpractice has resulted in payment of a judgment or settlement within the excess carrier’s policy limits, the insured has little incentive to enforce its right to competent representation. Refusal to permit the excess carrier to vindicate that right would burden the insurer with a loss caused by the attorney’s negligence while relieving the attorney from the consequences of legal malpractice. Such an inequitable result should not arise simply because the insured has contracted for excess coverage.
¶40. In Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves, 929 F.2d 103, 107 (2d Cir.1991), the United States Court of Appeals for the Second Circuit took the opposing view. In denying a claim by an excess insurer, it ruled:
To hold otherwise would in our judgment acknowledge a direct duty owed by the insured’s attorney to the excess insurer and would be tantamount to saying that insurance defense attorneys do not owe their duty of loyalty and zealous representation to the insured client alone. Such a holding would contradict the personal nature of the attorney-client relationship, which permits a legal malpractice action to accrue only to the attorney’s client. Such a holding would also encourage excess insurers to sue defense attorneys for malpractice whenever they are disgruntled by having to pay within limits of policies to which they contracted and for which they re *464 ceived premiums. Were this to occur, we believe that defense attorneys'would come to fear such attacks, and the attorney-client relationship would be put in jeopardy.
Id. (citations omitted).
¶ 41. The dissent is concerned that “[cjreating a cause of action for negligence wherein no privy of contract, nor attorney-client relationship exists, jeopardizes the sanctity of the attorney-client relationship.” We do not share this concern. Based on existing Mississippi authority, we agree with the conclusion from 4 New Appleman on Insurance Law Library Edition § 24.08[4] (2010), which states that “negligent defense attorneys should not be able to escape malpractice liability simply because an insured prudently purchased excess insurance. Nor should an excess or umbrella carrier bear responsibility for a loss that it did not cause or to which it did not contribute.”
¶ 42. We recognize that there is no Mississippi case authority that is directly on point. We do not extend Corson beyond its holding. However, we read Cor-son along with Mississippi Code Annotated section 11-7-20 (Rev.2004) to recognize that Mississippi is not a strict privity state. Therefore, based on the facts alleged in the amended complaint and because this is a Rule 12(b)(6) motion, this Court finds that there is a set of facts that would entitle Great American to relief. Therefore, as to Great American’s claim for legal malpractice, this Court finds that the Rule 12(b)(6) motion should be denied, and the trial court’s judgment is reversed and remanded for further proceedings.
3. Remaining Negligence Claims
¶ 48. The remaining negligence claims were not addressed in the trial court’s order. Thus, we must question whether in fact such claims were in fact dismissed by the trial court. It appears that they were not dismissed.
¶ 44. Nevertheless, we note that the amended complaint also asserted claims against Quintairos for negligence, gross negligence, and negligent supervision.
¶ 45. The amended complaint can be read to claim that Quintairos had a duty to employ and designate expert witnesses who could rebut the plaintiffs medical experts. The supreme court has held:
Case law generally “demands” that “in a medical malpractice action, negligence cannot be established without medical testimony that the defendant failed to use ordinary skill and care.” ... “Our general rule is that the negligence of a physician may be established only by expert medical testimony.” Expert testimony is required unless the matter in issue is within the common knowledge of laymen.
Palmer v. Biloxi Reg’l Med. Ctr., Inc., 564 So.2d 1346, 1355 (Miss.1990) (citations omitted).
¶ 46. A liability case against a nursing home is very much like a medical-negligence case. Expert testimony is required for the plaintiff to prevail. Mariner Health Care, Inc. v. Estate of Edwards ex rel. Turner, 964 So.2d 1138, 1144 (¶ 8) (Miss.2007). Likewise, the failure of the defendant to meet the testimony of the plaintiffs expert witness with similar expert testimony often is fatal to the defense. Certainly, the amended complaint alleges sufficient facts that: Quintairos owed a duty to designate expert witnesses to counter the plaintiffs expert witnesses; the duty was breached when Quintairos failed to do so; and Great American was damaged as a proximate result thereof. It appears that Great American has also asserted a negligence claim that would survive a Rule 12(b)(6) motion because the *465 elements of negligence have been addressed by the amended complaint. “The elements of negligence are duty, breach, proximate cause, and damages.” Corson, 612 So.2d at 373 (citing Lyle, 584 So.2d at 398-99).
¶47. Great American’s claim of negligent supervision is based on the following facts alleged in the amended complaint: Quintamos was a Florida based law firm that opened an office in Mississippi, relied on inexperienced lawyers, and did not have partners or adequate trial counsel to handle the cases assigned.
¶ 48. Accordingly, this Court finds that there is a set of facts that would entitle Great American to relief. Therefore, as to Great American’s claims for negligence, gross negligence, and negligent supervision, this Court finds that the Rule 12(b)(6) motion should have been denied; therefore, the trial court’s judgment is reversed, and this case is remanded for further proceedings consistent with this opinion.
B. Equitable Subrogation
¶ 49. In Count 1 of the amended complaint, Great American alleges a claim for “equitable subrogation.” Subrogation has been defined as “the substitution of one person in the place of another, whether as a creditor or as the possessor of any rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and to its rights, remedies, or securities.” Hutson v. State Farm Fire & Cas. Co., 954 So.2d 514, 517 (¶7) (Miss.Ct.App.2007) (quoting Ellis v. Powe, 645 So.2d 947, 951 (Miss.1994)).
¶ 50. In Hare v. State, 733 So.2d 277, 281-82 (¶ 17) (Miss.1999), the Mississippi Supreme Court ruled:
In support of this second point, the State argues that under Mississippi law two different types of subrogation exist:
(1) equitable subrogation arising from operation of law; and (2) conventional subrogation arising from contract. Union Mortgage, Banking & Trust Co. v. Peters, 72 Miss. 1058, 18 So. 497 (1895); St. Paul Prop. & Liability Ins. Co. v. Nance, 577 So.2d 1238, 1240 (Miss.1991). In Peters, this Court distinguished between the two as follows:
The principle of equitable subrogation does not arise from contract (for that is conventional subrogation), but is a creation of the court of equity, and is applied in the absence of an agreement between the parties, when otherwise there would be a manifest failure of justice.
Peters, 72 Miss, at 1060, 18 So. at 500. Similarly, the Nance Court noted that subrogation had equitable origins but that it could now arise in statutory or contractual contexts. Nance, 577 So.2d at 1240.
¶ 51. In Hutson, 954 So.2d at 517 (¶ 7), this Court held:
Subrogation has been defined by the Mississippi Supreme Court as follows:
Subrogation is the substitution of one person in the place of another, whether as a creditor or as the possessor of any rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and to its rights, remedies, or securities.
Ellis v. Powe, 645 So.2d 947, 951 (Miss.1994) (quoting St. Paul Prop. & Liab. Ins. Co. v. Nance, 577 So.2d 1238, 1240-41 (Miss.1991)). The subrogee “steps into the shoes of the subrogor” with respect to the debt or claim. Id. (citing Nance, 577 So.2d at 1241). Subrogation “is a creature of equity, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in equity and good conscience, ought to pay *466 it.” Oxford Prod. Credit Ass’n v. Bank of Oxford, 196 Miss. 50, 67, 16 So.2d 384, 388 (1944).
¶52. Great American asserts that a claim for equitable subrogation exists in Mississippi and that the claim was adequately pleaded in the amended complaint. Quintairos counters that Mississippi has not considered whether an excess insurer can pursue claims for legal malpractice against the attorney who represented the insured under an equitable-subrogation theory. The legal precedent cited above indicates that the Mississippi Supreme Court has recognized the claim of equitable subrogation. Likewise, it is also clear that no Mississippi case has ever considered whether an excess insurer may pursue a claim against an attorney for an insured, hired by the primary carrier, under the theory of equitable subrogation. Hence, this is a case of first impression.
¶ 53. The dissent quotes language from State Farm Fire and Casualty Company v. Weiss, 194 P.3d 1063, 1066-67 (Colo.Ct.App.2008) to support its policy decision to prohibit equitable subrogation of professional-negligence claims against a1> torneys. The dissent fails to mention that the outcome of Weiss is based on the fact that “Colorado law prohibits the assignment of legal malpractice claims.” Id. at 1065 (citing Roberts v. Holland & Hart, 857 P.2d 492, 495 (Colo.Ct.App.1993)). Mississippi law does not prohibit the assignment of legal-malpractice claims as does Colorado. See, e.g., Hartford Acc. & Indem. Co. v. Foster, 528 So.2d 255 (Miss.1988).
¶ 54. In Foster, 528 So.2d at 255, the Mississippi Supreme Court considered the duties an attorney owed to the insured when he was compensated by the insurer. In Moeller v. American Guarantee & Liability Insurance Co., 707 So.2d 1062, 1070 (Miss.1996), the supreme court expanded on the problems this relationship presented for the attorney and insurer, stating:
The attorney selected and employed by the insurance carrier, of course, has an ethical and professional obligation to represent the company. That attorney is the carrier’s attorney. This attorney also has an ethical and professional obligation to represent the insured in the defense of the claim, thus representing two separate and distinct clients. Routinely, and in the vast majority of cases, defense counsel is presented with no conflict of interest between the two. The claim is covered by the policy, and the insurance carrier will pay in full any judgment rendered against the insured. Yet, such counsel must be careful at the time he is asked to represent the insurance carrier and the insured, and if there is any reason indicating a possible conflict of interest at the time of his employment, he should under no circumstances undertake to represent them both. Furthermore, any attorney representing two clients must remain on alert and ever watchful for any possible conflict of interest arising between the two, because the moment that happens, counsel should not attempt to represent them both. Hartford Acc. & Indem. Co. v. Foster, 528 So.2d 255, 270 (Miss.1988); State Farm Mut. Auto. Ins. Co. v. Commercial Union Ins. Co., 394 So.2d 890, 894 (Miss.1981).
When an attorney is offered employment by an insurance carrier, he should first ascertain if there is any reason there might be a conflict in representing the carrier and the insured. Is the carrier defending under a reservation of rights? Is the amount sued for in excess of the policy limits? Is it possible that a portion of the claim may be covered, and another not, or that the policy covers one theory of liability, but not *467 another one? If so, he should undertake to represent only the interest of the insurance carrier for the part covered, and the insurance carrier should afford the insured ample opportunity to select his own independent counsel to look after his interest. Hartford Acc. & Indem. Co. v. Foster, 528 So.2d 255, 269 (Miss.1988); State Farm Mut. Auto. Ins. Co. v. Commercial Union Ins. Co., 394 So.2d 890, 894 (Miss.1981); Anthony v. Frith, 394 So.2d 867 (Miss.1981). Moreover, if during the representation of both parties a conflict of interest arises, defense counsel should withdraw from representation of either if there is any possibility that representing one and not the other may be injurious to the client the attorney ceases to represent. Hartford Acc. & Indem. Co. v. Foster, 528 So.2d 255, 270 (Miss.1988).
(Footnote omitted).
¶ 55. Quintarnos argues a claim for equitable subrogation would be against public policy. We recognize there are opposing views. We conclude that based on existing Mississippi case authority on equitable subrogation, Great American should be allowed to go forward with its claim in the insured’s place. Shady Lawn had no incentive to pursue a claim against Quin-tamos even if it believed Quintamos to be negligent because it had insurance in place to pay the settlement. Also, Royal had no incentive to pursue a claim if it believed the settlement value to be at or near the policy limits of the primary coverage regardless of the alleged malpractice. “The only winner produced by an analysis precluding liability would be the malpracticing attorney.” Atlanta Intern. Ins. Co. v. Bell, 438 Mich. 512, 475 N.W.2d 294, 298 (1991). Indeed, Great American and Shady Lawn have the same interest in this litigation — Shady Lawn’s competent representation.
¶ 56. Accordingly, this Court finds that there is a set of facts that would entitle Great American to relief. Therefore, as to Great American’s claim for equitable sub-rogation, this Court finds that the Rule 12(b)(6) motion should be denied, and the trial court’s judgment is reversed, and this case is remanded for further proceedings.
¶ 57. THE JUDGMENT OF THE WARREN COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RUSSELL, J. FAIR, J., NOT PARTICIPATING.

. The facts cited in this opinion are based on the factual allegations in plaintiff's amended complaint.

. The policy insured International Health Care Associates 61 Inc.; Vanguard Healthcare Management Services LLC; Vanguard Healthcare Holdings LLC; and Vanguard Healthcare LLC. The distinction between these entities is not a matter of consequence to this appeal. For the purpose of this opinion, the "insured(s)” under the policy are referred to as "Shady Lawn."

. The style of the case lists the defendant as "Royal Indemnity Company, individually, and in its capacity as successor in interest to Royal Insurance Company of America.” Royal is not a party to this appeal.

. The named insureds under both policies were the same.

. Great American's claims against Royal remain before the trial court and are not part of this appeal. Royal is not a party in this appeal. Royal’s attorneys have been copied on all motions and briefs filed with this Court.

. The trial court's Rule 54(b) certification appears to be without basis. At oral argument, counsel informed the Court that this appeal did not relate to the claims asserted by Great American against Royal. Yet the claims pending at the trial court had been stayed pending this appeal. The purpose of Rule 54(b) "is to avoid the possible injustice of a delay in entering judgment on a distinctly separate claim or as to fewer than all of the parties until the final adjudication of the entire case by making an immediate appeal available.” M.R.C.P. 54(b) Cmt. The expectation is that the underlying claims would proceed to trial promptly. Otherwise, this is simply another avenue to an interlocutory appeal. Here, the Rule 54(b) certification has delayed the trial court’s decision in the separate claim. This appeal has clearly not "secure[d] the just, speedy, and inexpensive determination of [this] action.” M.R.C.P. 1. A Rule 54(b) certification should allow the remaining claims to proceed, if for no other reason than judicial economy. If the trial court intends to stay further litigation pending the outcome of the appeal, such is a clear indication that a Rule 54(b) certification is not appropriate.

. The dissent does not address the claim of negligent misrepresentation. A claim for negligent misrepresentation is separate and distinct from a claim of legal malpractice, the remaining negligence claims, or a claim for equitable subrogation.

. It is difficult to imagine any more closely held secret or confidential communication between an attorney and his client than the attorney’s opinion of the "the settlement value” of a particular case. If we hold, as the dissent suggests, Great American was a “stranger" to the attorney-client relationship, then we also conclude that the disclosure of such information would not be protected from disclosure in discovery and should have possibly been produced by Quintairos to the plaintiffs in the Chase lawsuit. If the dissent’s view is accepted, trial courts must closely consider the correspondence of counsel to see if any communication has been made with an excess carrier; and if there is any such communication, such communications must be disclosed if the plaintiff asks for such information in discovery.