ON WRIT OF CERTIORARI

DICKINSON, Presiding Justice,
for the Court:
¶ 1. After the estate of a former resident sued a nursing home for negligent care, the primary insurance carrier employed lawyers to defend the suit. Because the *422 lawyers failed to timely designate an expert witness, the settlement value of the ease greatly increased, causing the nursing home’s primary carrier to pay its policy limits, and its excess insurance carrier to step in, defend the nursing home, and ultimately settle the suit. The excess carrier sued the law firm for professional negligence — both directly and under a theory of equitable subrogation. The trial court, finding the excess carrier and the lawyers had no direct attorney-client relationship, granted the law firm’s motion to dismiss.
¶ 2. We hold that — under the facts as alleged in the complaint — the doctrine of equitable subrogation applies, and the excess carrier may, to the extent of its losses, pursue a claim against the lawyers to the same extent as the insured. We further hold that the excess carrier has failed to allege a sufficient factual basis for a direct claim of professional negligence against the law firm.
BACKGROUND FACTS AND PROCEEDINGS
¶ 8. When a trial judge grants a motion to dismiss, we review questions of law reviewed de novo,[1] we take the allegations of the complaint as true, and we affirm only when it “appears beyond a reasonable doubt that the plaintiff will be unable to prove any set of facts in support of his claim.” [2] With that standard of review in mind, the essential facts[3] are these:
¶4. The estate of Huldah Chase sued Shady Lawn Nursing Home and Vicksburg Convalescent Home (“Shady Lawn”), claiming the home had provided Chase with negligent and inadequate health care.[4] Shady Lawn’s primary insurance carrier, Royal Indemnity Company, hired counsel to defend the suit.
¶ 5. Shady Lawn also had umbrella coverage through Great American E & S Insurance Services, Inc., the excess carrier, for claims that exceeded $1,000,000. Great American was not contractually obligated to defend Shady Lawn until the primary policy’s $1,000,000 limits had been exhausted, but it requested evaluations and assessments of the claim from defense counsel.
¶ 6. Defense counsel provided Great American with status reports, including an evaluation and opinion that the case’s settlement value was between $150,000 and $400,000. The reports also stated that counsel would need to designate experts and that a physician expert had been contacted, but not yet retained.
¶ 7. In November 2008, Royal reassigned the lawsuit to Quintairos, Prieto, Wood & Boyer P.A. (“Quintairos”). At that time, the deadline for designating experts was December 15, 2003. The plaintiff timely designated two expert witnesses, but Quintairos failed to designate experts before the deadline.
¶8. In January 2004, Quintairos sent Royal a status report noting it had not yet retained experts. The report further stat *423 ed that “based on known facts, this case could have the value of $250,000 in compensatory damages,” and a “trial value” of $500,000.
¶9. In February 2004, Quintairos attempted to designate a physician as an expert witness, but the plaintiff filed a motion to strike the witness. The trial court granted the motion and, as a result, Shady Lawn was left with no expert witness to appear at trial. This caused Quin-tairos to provide an “updated lawsuit evaluation,” increasing the settlement value of the case from $500,000 to between $3,000,000 and $4,000,000. Because all pri- or settlement and trial values of the lawsuit had been set well below the $1,000,000 amount necessary to implicate the excess policy, the “updated lawsuit evaluation” was Great American’s first notice that its excess coverage was in play.
¶ 10. Upon learning the new settlement value, and that the Quintairos law firm had no attorneys licensed in Mississippi who could represent the insureds at trial, Great American retained its own counsel to protect its interests and the interests of its insureds. Royal immediately tendered its policy limits, leaving Great American responsible for the case, and for any excess verdict at trial.
¶ 11. Great American paid an undisclosed sum to settle the ease, and then filed suit against the Quintairos firm, claiming legal malpractice, negligence, gross negligence, negligent misrepresentation, and negligent supervision. Great American also claimed it was entitled to recover under a theory of equitable subro-gation.
¶ 12. Quintairos filed a Rule 12(b)(6)[5] motion to dismiss, arguing that it had no attorney-client relationship with Great American. The trial court granted the motion and dismissed all of Great American’s claims against Quintairos. The Court of Appeals (“COA”) reversed, holding that Great American properly had alleged claims for negligence and equitable subrogation.[6] Most notably on the direct-negligence claims, the COA found that Great American had sufficiently pleaded an attorney-client relationship, because Quintairos had provided Great American with an evaluation of the Chase lawsuit’s settlement value; thus the law firm had provided Great American with legal services. Because the case presents an issue of first impression, we granted certiorari to review whether an attorney-client relationship is necessary for a claim of legal malpractice, and whether an excess insurer can bring a claim against a primary insurer’s attorney under a theory of equitable subrogation.
ANALYSIS
¶ 13. Great American clearly pleaded a sufficient factual basis to establish that Quintairos was negligent and committed legal malpractice. Judge Grif-fis’s opinion, speaking for the COA, clearly set forth why Great American may pursue an equitable subrogation claim against Quintairos,[7] and we adopt the COA’s opinion and holding on this point.
¶ 14. In dissent, Justice Chandler expresses concern that a lawyer “hired by a primary insurer to defend the insured already has a duty of care toward the insured and the primary insurer,” and that the “practical effect of today’s decision is *424 to impose a duty of care toward the excess insurer as well.”[8] This is incorrect.
¶ 15. We do not expand or change the duty owed by counsel to the client. We hold only that, when lawyers breach the duty they owe to their clients, excess insurance carriers, who — on behalf of the clients — pay the damage, may pursue the same claim the client could have pursued. Holding otherwise would place negligent lawyers in a special category of protection. And we note that the path we follow today is not novel. As the Supreme Court of Texas noted in a similar case, “subrogation permits the insurer only to enforce existing duties of defense counsel to the insured.” [9]
¶ 16. While we agree with the COA’s discussion of equitable subrogation, we are unable to agree with the COA’s finding that Great American may pursue direct claims of legal malpractice against Quintai-ros. Most of the reasons for our holding on this point are succinctly set forth in paragraphs 59, 60, and 63, of Judge Carlton’s thoughtful dissent.[10]

Legal malpractice

¶ 17. To plead legal malpractice, a plaintiff must provide sufficient facts to establish three elements: (1) an attorney-client relationship; (2) the attorney’s negligence in handling the client’s affairs; and (8) proximate cause of the injury.[11]
¶ 18. The Court of Appeals held that Great American sufficiently pleaded an attorney-client relationship. We disagree. Great American’s amended complaint says nothing about its relationship with Quintairos. Instead, Great American argues that Quintairos provided it with legal services when it sent Great American the case-status reports that estimated the settlement and trial values of the case. Taken as true, these case-status reports— without more — are insufficient to establish an attorney-client relationship.
¶ 19. Great American would have us hold that an attorney employed by a primary insurance carrier — simply by providing an excess carrier with courtesy copies of its settlement evaluations — establishes an attorney-client relationship. For us to accept Great American’s view would require us to ignore the realities of real-world litigation, which often involves several defendants with common interests. Indeed, we have recognized that the respective lawyers of two or more clients with common interests in litigation may do far more than share settlement opinions without establishing an attorney-client relationship.[12]
¶ 20. Great American also argues that, in Century 21 Deep South Properties, Ltd. v. Corson,[13] this Court abolished the attorney-client relationship requirement in legal malpractice suits, and that an attorney is liable to all reasonably foreseeable third parties who rely on the attorney’s work.[14] Great American is incorrect.
¶ 21. In Corson, we abolished the absolute requirement of an attorney-client relationship in title-work cases, and we held *425 that liability may be extended to “foreseeable third parties who detrimentally rely” on the attorney’s negligent conduct.[15] One of our reasons was that Mississippi Code Section 11-7-20, which states that privity is not required to maintain an action for economic loss brought on account of negligence,[16] conflicts with the elements of legal malpractice to the extent that privity is required.[17] But the absence of a need of privity was not our only reason.
¶22. In limiting Corson to claims involving “title work,”[18] we recognized that lawyers who perform title work are fully aware that their work will be relied upon by subsequent purchasers and lienors of property. It is common knowledge that the client of an attorney performing a subsequent title update relies on the prior title opinion and whether that opinion revealed any deficiencies.[19] Thus, an attorney engaged to perform title work is expected by the client to protect not only the client, but those who later rely on the attorney’s opinion.
¶ 23. This is not the case in the liability-insurance carrier context, where attorneys often provide information and strategies to others with common interests in litigation. Unlike the client in the title-work contest, a policy holder (such as Shady Lawn in this case) generally gains no benefit from its counsel sharing information with the excess insurance carrier. Such information is shared as a courtesy, with no expectation of an attorney-client relationship.
¶24. Because an attorney-client relationship is an essential element in a legal-malpractice claim, and because Great American failed to plead sufficient facts to establish an attorney-client relationship, we reverse the Court of Appeals’ decision on this issue and affirm the trial court’s dismissal of any direct legal-malpractice claim against Quintairos.

Negligence, gross negligence, and negligent supervision

¶ 25. Great American’s claims for ordinary negligence, gross negligence, and negligent supervision all allege that Quin-tairos breached its duty in providing legal services to Shady Lawn. As we have said, “a legal malpractice action is a negligence action dressed in its Sunday best.”[20] A plaintiff, therefore, must allege something other than professional negligence to establish an ordinary negligence claim. For instance, lawyers who fail to maintain their offices in a reasonably safe manner are subject to their clients’ ordinary negligence claims. But here, Great American has alleged nothing more than professional negligence. And because Great American failed to establish an attorney-client relationship, we reverse the Court of Appeals’ decision on this issue and affirm the trial court’s dismissal of these direct claims against Quintairos.
¶26. In his separate opinion, Justice Randolph would have us hold that a lawyer rendering legal services may be held liable for all foreseeable harm — even to non-clients. We decline to follow this unwise path for many reasons.
¶ 27. For instance, lawyers attempting to fulfill their ethical duty to their clients often provide advice and make decisions that clearly will cause harm to others. One example often occurs in cases involving several defendants represented by sep *426 arate counsel. The defense lawyers and the various defendants often collaborate by sharing opinions and strategy. But the lawyers have an absolute duty of loyalty to their respective clients — a duty that very well could require them to make decisions and give advice that will bring foreseeable harm to the others.
¶ 28. Stated another way, a plaintiffs negligence claim cannot survive unless the defendant had a duty to the plaintiff. A lawyer’s duty to the client must be absolute and uncompromised; and the lawyer must be free to provide advice to the client — even where that advice might bring harm to others.
¶ 29. In addition, Justice Randolph misapplies Berkline Corp. v. Bank of Mississippi[21] That case did not involve an attorney-client relationship. There, we said that when a bank supplies credit information, “the bank and its officers are bound to use the skill and expertise which they hold themselves out to the public as possessing.” [22] Thus, unlike the attorney-client relationship — which requires the attorney to act in the client’s best interests, even to the detriment of others — the bank voluntarily undertook a duty to the public.[23] So we must reject the notion that lawyers may be sued for professional negligence by persons with whom they have no attorney-client relationship.

Negligent misrepresentation

¶ 30. Great American alleged in its complaint that Quintairos misrepresented the value of the cases. To establish this misrepresentation, Great American asserts that each case settled for amounts higher than those stated in the case-status reports.
¶ 31. To establish negligent misrepresentation, a plaintiff must prove “(1) a misrepresentation or omission of fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.”[24]
¶ 32. Here, Quintairos’s case valuations provided opinions. Stated another way, Great American has alleged no facts in its complaint that suggest that the opinions expressed by Quintairos were misrepresented. Providing bad opinions is not misrepresentation; it is negligence. Providing an opinion that one does not actually hold is misrepresentation. We therefore reverse the Court of Appeals’ decision on this issue and affirm the trial court’s dismissal of this claim.
CONCLUSION
¶ 33. For the reasons stated, we reverse the trial court’s dismissal of Great American’s lawsuit with respect to its claims under equitable subrogation, and we affirm the Court of Appeals’ decision on this issue. But we reverse the Court of Appeals on all other issues and reverse the trial court’s grant of the motion to dismiss, remanding the case Circuit Court of Warren County so that Great American may *427 move forward with its claim based on equitable subrogation alone.
¶ 84. THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY IS AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
WALLER, C.J., CARLSON, P.J., AND LAMAR, J., CONCUR. RANDOLPH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND PIERCE, JJ. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. KING, J., NOT PARTICIPATING.

. King v. Bunton, 43 So.3d 361, 363 (Miss.2010) (citing Ralph Walker, Inc. v. Gallagher, 926 So.2d 890, 893 (Miss.2006)).

. Meadows v. Blake, 36 So.3d 1225, 1229 (Miss.2010) (quoting Penn Nat'l Gaming, Inc. v. Ratliff, 954 So.2d 427, 430-31 (Miss.2007)).

. For a more comprehensive recitation of the facts, see Great American E. & S. Ins. Co., v. Quintairos, Prieto, Wood & Boyer, 100 So.3d 453 (Miss.Ct.App.2012).

. The lawsuit, filed in the Circuit Court of Warren County, was styled The Estate of Huldah Chase, et. al. v. International Healthcare Properties, et al., No. 02-0133CT ("Chase lawsuit”).

. Miss. R. Civ. P. 12(b)(6).

. Great American v. Quintairos, 100 So.3d 420, 466-67 (Miss.Ct.App.2012).

.Id. at 465-67.

. Dis. Op. ¶ 46.

. Am. Centennial Ins. Co. v. Canal Ins. Co., 843 S.W.2d 480, 484 (Tex.1992).

. Great American v. Quintairos, 100 So.3d 420, 467-69.

. Pierce v. Cook, 992 So.2d 612, 617 (Miss.2008).

. See generally Miss. R. Evid. 502(b); Williamson v. Edmonds, 880 So.2d 310 (2004).

. Century 21 Deep South Properties, Ltd. v. Corson, 612 So.2d 359 (Miss.1992).

. See id. at 374.

. Id.

. Miss.Code Ann. § 11-7-20 (Rev.2004).

. Corson, 612 So.2d at 373.

. Corson, 612 So.2d at 374.

. Id.

. Id. at 373.

. Berkline Corp. v. Bank of Mississippi, 453 So.2d 699, 702 (Miss.1984).

. Id.

. See id.

. Horace Mann Life Ins. Co. v. Nunaley, 960 So.2d 455, 461 (Miss.2007) (citing Skrmetta v. Bayview Yacht Club Inc., 806 So.2d 1120, 1124 (Miss.2002)).