# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00460-COA

**ELIZABETH SNYDER, MARLENE SNYDER AND VICTORIA SNYDER**                    APPELLANTS

v.

**DAVID PILGER, PILGER TITLE CO., PAUL BOUDREAUX AND SOUTHERN PROPERTIES UNITED LLC**                    APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 03/15/2024 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM LEE GUICE III |
| | ALBERT RALPH JORDAN IV |
| | GEORGE W. HEALY IV |
| | MARIA MARTINEZ |
| | MATTHEW LIENHARD SCHLOEGEL |
| ATTORNEYS FOR APPELLEES: | LAWRENCE MATTHEW QUINLIVAN |
| | CASE THOMAS MAYER |
| | ZACHARY STOKES WESSLER |
| | TAYLOR ANNE PILGER |
| | STEPHEN WAYNE DUMMER |
| | HEATH MICHAEL LADNER |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 08/26/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Elizabeth Snyder, her mother Marlene Snyder, and Elizabeth's sister Victoria Snyder

appeal from a Harrison County Circuit Court's order granting David Pilger and Pilger Title

Company's motion to dismiss or, alternatively, for summary judgment.[1] The circuit court dismissed the Snyders' claims of fraud, civil conspiracy, and breach of numerous duties that they alleged Pilger owed them concerning Elizabeth's purchase of a home from Paul Boudreaux and Southern Properties United LLC (SPU). On appeal, the Snyders contend that the circuit court erred because material facts were in dispute precluding summary judgment concerning whether Pilger, the closing attorney, and his company owed the Snyders a duty to disclose key information, namely that the home had a history of water intrusion and that Boudreaux had only purchased the house earlier on the same day that he sold it to Elizabeth (referred to as a "double escrow" or a "flip"). Having considered the record, the arguments of the parties, and relevant precedent, we affirm the circuit court's summary judgment in favor of Pilger.[2] We further grant Pilger's motion to dismiss the Snyders' appeal from the circuit court's order on attorney's fees.

**Facts**

*Verdin Purchase of the Home*

¶2.     In 2017, Sharlene Verdin purchased a home in Gulfport, Mississippi, from Charles Bolton for $55,000. Pilger, through his title company, Pilger Title Company, served as the closing attorney on that transaction.[3] The home was priced low because Bolton experienced

---

[1] We refer to Elizabeth as "Snyder" in this opinion but use her first name for clarity when needed.

[2] The Snyders sued other parties who were dismissed during the litigation. In a separate ruling, the court denied Boudreaux and SPU's motion for summary judgment, which is not being reviewed for error in this appeal.

[3] We refer to Pilger and Pilger Title Company collectively at times as Pilger.

flooding issues, and Verdin confirmed that Bolton gave her a property disclosure statement that noted water intrusion. However, Verdin later testified that she made repairs that resolved these issues after she bought the home. Verdin said:

> I had – I bought it knowing it had – the sunken little rooms, two of the rooms were lower than the rest of the house, which was something in the '60's, I think, was popular. And I told him what I had done. I got water in there. It took me a couple of months to get all this stuff done then the problem was fixed.

Verdin said that after putting in a French drain and doing the other work, water got into the house a couple of times "but not hardly any . . . . So that's when the pumps went in." She said she installed two pumps that kept the groundwater from filling up, one in the front by the breezeway and a second one just to be "extra careful." She said these pumps were in plain sight and that she told Boudreaux, to whom she sold the house in 2021, about them. Verdin said no water got into the house after the pumps were installed. As a matter of fact, after a hurricane, when other homes in the neighborhood were flooded, she returned to find her home "bone dry."[4] Boudreaux recalled Verdin telling him about some ponding in the yard that was mitigated, but nothing about water in the home.

*Snyder Purchase of the Home*

¶3. On September 24, 2021, Verdin decided to sell the home and signed a sales agreement

---

[4] Verdin also said that water sometimes got to the front door because a city-maintained ditch on the side of the house would back up after a heavy rain if it had not been cleaned out by the city. The water would come up her driveway and get under the front door of the house. She would put a towel there, and within an hour, the water would recede. It never lasted more than forty-eight hours. The city cleaned the ditch every four years, but she still had to call them and was often put on a wait list. She said she told Boudreaux all of this.

with Boudreaux, acting on behalf of SPU, to purchase it for $130,000.[5]  Verdin also signed

a sales and marketing limited power of attorney appointing SPU as her agent to market and

sell the property and to sign sales documents on her behalf.  Boudreaux and SPU then

contracted with Ralph Harvey and his company, ListwithFreedom, to market and sell the

property.

¶4.     On October 5, 2021, SPU (Boudreaux) completed a Property Condition Disclosure

Statement that is required of property sellers under Mississippi Code Annotated section 89-1-

503 (Rev. 2024).[6]  In this document, which was presumably attached to the home's listing,

---

[5]  Later, during the litigation, Verdin's attorney represented to the court that Verdin
was elderly (age seventy-nine), her husband worked offshore, and her children in Louisiana
wanted her to live closer to them.  Verdin saw an ad on TV for "Irby Buys Houses" and
called.  Irby gave her a quote, and then her daughter suggested that she go online to find
other similar businesses.  Verdin called several of them and received other quotes.  SPU
gave her the best offer, so she took it.  However, there was no testimony or documents in the
record establishing these facts.

[6]  This section provides:

(1) The transferor of any real property subject to Sections 89-1-501 through
89-1-523 shall deliver to the prospective transferee the written property
condition disclosure statement required by Sections 89-1-501 through
89-1-523, as follows:

(a) In the case of a sale, as soon as practicable before transfer of title.
(b) In the case of transfer by a real property sales contract, or by a lease
together with an option to purchase, or a ground lease coupled with
improvements, as soon as practicable before execution of the contract.
For the purpose of this paragraph, "execution" means the making or
acceptance of an offer.

With respect to any transfer subject to paragraph (a) or (b), the transferor shall
indicate compliance with Sections 89-1-501 through 89-1-523 either on the
receipt for deposit, the real property sales contract, the lease, or any addendum
attached thereto or on a separate document.

Boudreaux checked that he had title to the residence. In response to the question on the disclosure form, "[A]re you aware of the existence of any of the following: standing water and drainage problems," Boudreaux answered, "unknown." He answered "no" to the question of whether he was aware if the property had ever had standing water in the front, rear, or side for more than forty-eight hours following a heavy rain. He also answered "no" to the question concerning whether any portion of the interior ever suffered water damage. Boudreaux said he answered these questions based on the information he received from Verdin and that he had no personal knowledge of the condition of the home at the time Verdin bought the property from Bolton.[7] Boudreaux listed the property on October 6, 2021,

> If any disclosure, or any material amendment of any disclosure, required to be made by Sections 89-1-501 through 89-1-523, is delivered after the execution of an offer to purchase, the transferee shall have three (3) days after delivery in person or five (5) days after delivery by deposit in the mail, to terminate his or her offer by delivery of a written notice of termination to the transferor or the transferor's agent.
>
> (2) If a transferor of real property subject to Sections 89-1-501 through 89-1-523 shall fail to deliver the disclosure statement required by Sections 89-1-501 through 89-1-523, or fails to complete some portion of the disclosure statement, the prospective transferee is presumed to be on notice to inquire of the transferor concerning the content of the disclosure or the lack thereof. Any duly licensed real estate broker or salesperson involved with the transaction shall have no duty or obligation nor be subject to discipline or other action of any kind by any licensing authority of the State of Mississippi, pertaining to the disclosure or the failure of any disclosure to comply with Sections 89-1-501 through 89-1-523.

Miss. Code Ann. § 89-1-503.

[7] On October 5, 2021, Boudreaux, on behalf of SPU, and Harvey also signed a disclosure of information on lead-based paint, asserting they had no knowledge of lead-based paint in the home. Snyder and her agent, Keri Burke, acknowledged receipt of the document on October 8 and 10, 2021, respectively.

at a sales price of $149,000.

¶5.     On October 8, 2021, Elizabeth, Marlene, and Victoria Snyder toured the Verdin home with their agent, Keri Burke. Boudreaux was at the home at the time, dog sitting for Verdin. He told the group to walk around while he continued to work on his laptop, and he would answer any questions they had. They did this, and Boudreaux said Burke only asked him to walk the property line—nothing else. However, all three Snyders signed affidavits, and Elizabeth later testified that Boudreaux specifically told them there were no water issues with the home, that the gravel by the foundation was a French drain Verdin had installed, and that an electrical connection in the back yard was for a pump in the pond.

¶6.     On October 9, 2021, at her agent's recommendation, Snyder made an offer to purchase the home for $156,533.15, which was higher than the listed price. The proposed sales contract identified the buyer as "Elizabeth Snyder" and the seller as "Verdin Sharlene." The contract was contingent on Snyder securing financing, on an appraisal confirming the listed price, and upon a satisfactory inspection conducted by Snyder at Snyder's expense. The seller (Verdin) would not pay any closing costs, nor would Verdin have to provide a property disclosure statement.[8]

¶7.     On October 12, 2021, SPU counter-offered through a proposed addendum to the sales contract. In the addendum, the selling parties were identified as "Sharlene Verdin and or Southern Properties United, LLC POA." SPU offered to sell the home for $161,000.

---

[8] Snyder said her agent told her to sign the addendum that waived the "Property Condition Disclosure Statement" because they were going to get a home inspector to look at the house.

6

According to Pilger, Boudreaux and Burke decided to use him as the closing attorney. Although Pilger had previously handled a number of transactions where Boudreaux was a party, Pilger said the total number was relatively small when compared to Pilger's total business (0.003 percent).[9] Snyder agreed to the counter-offer and signed the addendum as well as Boudreaux's property disclosure statement that same day.

¶8. On October 20, 2021, Jaime Bobbitt of J.R.B Enterprises LLC completed an inspection for Snyder and prepared a forty-page report. The report noted that the fifty-year-old home was of average quality but lacked maintenance. The report recommended items for repair or for further inspection, noting cracks on the exterior walls in the front as a "major concern." Although not "substantial," the inspector recommended that a structural engineer be consulted to evaluate these concerns. The inspection was performed on a dry day, though there had been occasional rain on the days leading up to the date of the inspection. The report noted water staining in the master bedroom, hall bathroom, kitchen pantry, and garage, but did not make any recommendation for a follow-up.[10] The inspector noted a number of improvements that would be needed to repair the electrical and cooling systems and the plumbing. Based on this report, on October 25, 2021, Snyder removed the inspection contingency in the contract and accepted the property "as is," provided that Boudreaux make

---

[9] Pilger said he pulled the number of closings his office handled for Boudreaux, finding seven in 2019, thirteen in 2020, and seventeen in 2021, which Pilger said represented "probably 0.003 percent of my closings, so like nothing." Boudreaux stated that he used several other title companies in addition to Pilger.

[10] Verdin testified that she told the inspector about water coming into the breezeway and how she installed sump pumps to deal with water in the yard. She said she also showed the inspector the sunken room where the water used to come in.

7

several repairs prior to purchase.[11]

¶9.     On October 29, 2021, Snyder's lender for the purchase, Amerifirst Financial Inc., obtained an appraisal from Fairway Appraisals LLC, which appraised the property at a market value of $169,000.  Using a comparison sales approach, the appraiser valued the property at that same amount, but when using the cost approach, the value increased to $184,000.  The appraisal did not identify any prior flooding or water issues.

¶10.     On November 15, 2021, prior to the parties' closing, Amy Brand, a branch manager with Amerifirst, contacted Pilger concerning title to the property.  Old Republic Title Insurance Company, which was issuing the title insurance, needed an updated title history from Pilger because the last title transfer noted was the Bolton to Verdin conveyance. Concerning her conversation with Pilger about this history, Brand communicated with her team the following:

> I spoke with David Pilger and he mentioned that this property has not transferred ownership as of yet but there is a contract for purchase from the current owner and this will be executed all at the same time of the sale. . . . NOTE: this is not the first time nor will it be the last time we see this type of thing so we want to be sure we get it correct the first time.

*Closing*

¶11.     In November 2021, the parties closed on their sales agreements at the offices of Pilger Title Company.  According to Pilger, on November 12, 2021, Verdin signed the deed and

---

[11]   A list of the repairs was contained in a document entitled "Home Inspection Contingency Notification/Removal Addendum."  The repairs included replacing a broken window, replacing the electrical breaker panel box, servicing the AC unit, adding a shut-off valve to the water heater, completing installation of the flooring and trim, securing boot vents, adding weather stripping around the garage door, and repositioning the dishwasher waste line.

other paperwork, which her husband, Ebdon Phillip Verdin, had signed a few days earlier.

On November 16, 2021, Boudreaux signed the rest of the paperwork to complete SPU's

purchase of the property from Verdin. Boudreaux then met with Snyder later that day and

deeded the home to her on behalf of SPU. At that closing, Snyder and Boudreaux both

signed a "Non-Representation Acknowledgment, Compliance Agreement and Limited Power

of Attorney." In that document, both agreed:

> We, the undersigned parties, acknowledge and agree that David B. Pilger & Taylor A. Pilger, Attorneys, nor any other employee of Pilger Title Co. do not represent any party to this transaction in an attorney/client relationship as their duties are to simply to facilitate the closing transaction based on the terms that have already been agreed to by the Parties. All Parties may hire their own legal representation with regard to this transaction and to this document.

Both also granted Pilger a limited power of attorney to correct any and all clerical errors or

other errors discovered in the closing documents. Then, on that same day, Elizabeth

conveyed the property to herself, her mother Marlene, and Elizabeth's sister Victoria. Pilger

did not personally attend either of the closings but, instead, assigned an associate to handle

them in his place.

*Court Proceedings*

¶12. On November 29, 2021, the Snyders prepared to move into the home. However, they

learned from neighbors that water had previously seeped through the floor in certain rooms

and that these neighbors had helped Verdin pump the water out and rip out flooring in the

past.[12] This prompted the Snyders to file suit on March 4, 2022, in the Harrison County

---

[12] During discovery, Snyder identified these neighbors as Jeanette Butler and Taffy and James Birdsong. But no deposition testimony or affidavits from these individuals appears in the record. It is unclear from the record whether Snyder personally experienced

9

Circuit Court against Verdin, Boudreaux, SPU, Pilger, Pilger Title Company, ListwithFreedom, Harvey, and Amerifirst.

¶13. In their complaint, the Snyders sued all the defendants for breach of fiduciary duty by failing to disclose that the property had water intrusion issues and failing to disclose the same-day double closing, which they called "flipping." They also alleged these omissions supported claims of negligent misrepresentation, fraud, intentional misrepresentation, breach of contract, negligence, failure to warn, constructive fraud, civil conspiracy, and breach of the implied covenant of good faith and fair dealing by all defendants. The Snyders specifically alleged that "Pilger was engaged as the attorney and closing agent to handle the transaction and at all times mentioned herein Pilger owed a fiduciary duty to the parties to that transaction including, but not limited to the Plaintiffs." They specifically pled a "negligence and malpractice" claim against Pilger for failing to handle the closing transaction "according to the standard of care" and "in a manner as is consistent with agents of title companies and closing attorneys." They sought $1 million in damages, punitive damages, statutory damages under the Real Estate Broker's License Law (Mississippi Code Annotated section 73-35-31 (Rev. 2017)), and attorney's fees.

¶14. Pilger and Pilger Title answered the complaint on April 5, 2022, denying the allegations and raising numerous defenses, including the failure to state a claim for which

---

water in the home prior to filing suit. In an affidavit she signed later in the litigation (September 9, 2022), Snyder stated, "We experienced significant flooding in our home during the *recent* heavy rainfall" and attached photos. But at her deposition, she agreed that the house was habitable, that they could live there, and that she had not hired any contractor to fix the problem.

10

relief could be granted. The other defendants also answered and filed crossclaims and counterclaims against Snyder.[13]

¶15.   The parties exchanged written discovery. Wells Fargo Bank, which was substituted for Amerifirst, filed a motion to dismiss, which the Snyders confessed, leading to Wells Fargo's dismissal.[14]

¶16.   On July 17, 2022, Verdin filed a motion for partial summary judgment, asserting that she had no contact with Snyder and, thus, could not have intentionally or negligently misrepresented the condition of the property to her. Verdin also claimed that she had no contract with Snyder that she could have breached or by which she assumed any fiduciary duty to Snyder. Verdin said that even without depositions or discovery, no facts supported any claim against her.

¶17.   The parties, except Pilger, attempted mediation but were unsuccessful. In response to Verdin's motion for partial summary judgment, Snyder sought a Rule 56(f) continuance until depositions could be taken. *See* M.R.C.P. 56(f). In support, Snyder attached an affidavit relating the unsuccessful mediation and photographs of the water intrusion she said she had recently experienced.

---

[13] Verdin included a crossclaim against Boudreaux for misrepresenting his status as a realtor. Boudreaux crossclaimed against Verdin in his answer, stating that neither he nor SPU held themselves out to be real estate agents or brokers and further alleging that Verdin had represented that the property had suffered no known water intrusion damage. Verdin answered Boudreaux's crossclaim and sought an order requiring arbitration. Boudreaux also filed a counterclaim against the Snyders for libel, slander, and defamation.

[14] The Snyders also agreed to dismiss Harvey and ListwithFreedom on October 4, 2022.

11

*Other Motions*

¶18.   On August 25, 2022, Boudreaux and SPU filed a motion to dismiss Snyder's complaint, raising, among other things, Marlene's and Victoria's lack of standing. Boudreaux and SPU also requested that Snyder's agent, Burke, be joined as a necessary party or that the court allow them to file a third-party complaint against Burke.

¶19.   On September 2, 2022, Pilger filed a joinder to Boudreaux and SPU's motion to dismiss Marlene and Victoria for lack of standing and further moved to dismiss Snyder's claims against Pilger for failing to state a claim for relief pursuant to Mississippi Rule of Civil Procedure 12(b)(6).   They attached the "Non-representation Acknowledgment, Compliance Agreement, and Limited Power of Attorney" that Snyder had signed at the closing in which she acknowledged that Pilger was not her attorney and that she could hire her own attorney if she desired.   Pilger also attached an affidavit signed by Amy Brand, the branch manager for Amerifirst who worked with the parties in the financing of Snyder's purchase.   Brand confirmed that during her pre-closing communications with Pilger, he disclosed to her that SPU did not hold title to the property, but title would vest before the transaction between SPU and Snyder closed.   Brand attached a string of emails in which she spoke of her conversations with Pilger.   Brand further stated that it did not matter to her, as branch manager for Amerifirst, how the transaction between Verdin and SPU was funded. Pilger argued that he had no attorney-client relationship with Snyder and no duty to disclose to her that the sale from Verdin to SPU had just occurred that day or disclose the Verdin/SPU sales price.

12

*Motions Hearing on September 16, 2022*

¶20.    Several motions were set for hearing on September 16, 2022.  One, a motion to compel, was resolved by the parties.  Snyder argued that she needed depositions of the defendants in order to establish key facts needed for her to defend the motions to dismiss or for summary judgment.  Verdin, Boudreaux, and Pilger argued that depositions were not needed and that under the law, Snyder's claims against them failed.  The court decided to grant Snyder's Rule 56(f) motion and allowed her to take the depositions of Verdin, of Boudreaux, individually and on behalf of SPU, and of Pilger, individually and on behalf of Pilger Title Company.[15]  Snyder could also be deposed.  The court continued the hearing on other outstanding motions.[16]

¶21.    In December 2022, the Snyders took the depositions of Boudreaux, SPU, and a Rule 30(b)(6) deposition of Pilger Title Company.  *See* M.R.C.P 30(b)(6).  During that deposition, Pilger testified that he wrote title insurance for Old Republic Title Insurance Company.  He further testified that Old Republic insures "double" escrow closings and that he followed no special procedure in such closings.  Snyder was also deposed.

¶22.    On December 21, 2022, Snyder presented an agreed order dismissing Verdin without prejudice, with the parties bearing their own costs.

---

[15]  The court cautioned Snyder, however, that should Verdin prevail on her motion for partial summary judgment and should the court find the complaint against Verdin to be frivolous, Snyder would bear the costs of all the depositions.

[16]  Because the parties could not agree on specific dates for filing supplemental pleadings after depositions were taken, the court entered its own order on November 7, 2022.  In it, the court set dates for the taking of depositions and deadlines for filing supplemental pleadings and responses.

¶23.   On January 17, 2023, Snyder filed a motion under Rule 56(f) for permission to serve a subpoena on Old Republic to confirm Pilger's testimony.  Pilger opposed the motion, arguing that even if Old Republic did have policies or procedures for double closings, they were irrelevant to whether Pilger owed a duty to Snyder because the complaint contained no allegation concerning the validity of the title to the property.  Also, Pilger argued that Snyder had no standing to raise any claims that Old Republic may have against Pilger.

¶24.   On January 30, 2023, Pilger and Boudreaux each filed motions to dismiss or, alternatively, for summary judgment again.

*Motions Hearing on February 17, 2023*

¶25.   The court heard Snyder's request to issue a subpoena to Old Republic, during which Snyder argued that Pilger testified in his deposition that Old Republic insured double closings.  Snyder then asked Pilger, "Do you have any procedures you have to follow to do a double escrow?"  Pilger replied, "No."  Snyder argued to the court that she had a title insurance expert who said that Old Republic did have "rules and regulations" concerning double escrows.  Snyder wanted to subpoena Old Republic for those rules (1) to verify Pilger's testimony and (2) to establish Pilger's duty and negligence.  Pilger responded that no claim in the complaint concerned a problem with the title to the property.  Moreover, even if Pilger breached some duty to Snyder's lender, Snyder herself had no standing to raise that claim.

¶26.   The court held that Pilger was not specifically asked if Old Republic maintained rules to follow.  Thus, Pilger's credibility was not a basis for the issuance of a subpoena.  More

14

importantly, if Old Republic had a procedure on double escrows, the court explained, "[t]hat's between Old Republic and Pilger. . . . [I]t has nothing to do with the plaintiff . . . [and] whether these procedures were followed have nothing to do with what is claimed in the complaint." Whether Pilger followed Old Republic's rules in handling the escrow money or title was not relevant to the case. The court went further and found that Snyder's motion for the subpoena was frivolous and unnecessary. The court asked the defendants if they wanted to go forward on a request for attorney's fees at that point or wait until the summary judgment motions were heard. The defendants opted to reserve the issue until the summary judgment hearing.

*Supplemental Motions and Responses*

¶27. Snyder responded to both Pilger's and Boudreaux's January 2023 motions on March 1, 2023. In response to Pilger, Snyder asserted that she was "conned into buying a house with water intrusion issues" and paying an inflated price. In addition, she said SPU used her purchase money to fund its purchase of the home from Verdin, which Snyder termed a "double escrow" and considered illegal. She contended that Pilger knew of the fraud and failed in his legal and ethical duties to disclose the condition of the home and that the transaction was part of a double escrow. Basically, she accused Pilger of legal malpractice. In addition to attaching documents and deposition excerpts to support her argument, Snyder attached affidavits from her experts: Ben Cooper, a law professor at the University of Mississippi School of Law; Bushnell Nielsen, a nationally known title-insurance attorney; and Michele Avery, a CPA and forensic accountant.

15

¶28. Cooper opined that "regardless of whether Pilger was performing legal work or law-related services for Plaintiffs, he was obligated to follow the Rules [of Professional Conduct] and other law governing lawyers." Cooper said that Pilger had a duty of loyalty and a duty to communicate truthfully to Snyder and that the "Non-Representation Agreement" Snyder signed at the closing was "ineffective" because Snyder had not "waived informed consent." Cooper stated that Pilger, as the only attorney present at the closing, represented both parties.

¶29. Nielsen, a Wisconsin attorney and author of "Title and Escrow Claims Guide," published by the American Land Title Association, was of the opinion that the "flip" transaction here was fraudulent because SPU "knew that one or both sales would unravel if all of the parties knew there were two sales, at different prices, and that Plaintiffs' money would be used to fund Southern's purchase under the first contract." In Nielsen's opinion, Pilger agreed not to disclose the double escrow and arranged for two separate meetings "to keep the parties from inadvertently coming into direct contact with one another" and learning the facts. In summary, Nielsen stated:

> [I]t is my expert opinion that Pilger violated industry custom and practice by failing to inform Snyder that there would be two simultaneous sales of the house, that there was a significant difference in the two sales prices, and that the information she had received from Boudreaux about the house's physical condition was either worthless or potentially fraudulent.

¶30. Nielsen further opined that Pilger's "concealment of the double escrow from Amerifirst" harmed Snyder because Amerifirst would have been obligated to disclose the double escrow to her. Nielsen stated that it was "customary" that the title attorney "retained to be the lender's closing agent" would inform the lender of these facts. In Nielsen's

opinion, Pilger misrepresented to Amerifirst that SPU held title to the property. Nielsen provided other opinions concerning the liability of SPU and Boudreaux, including their fraudulent actions to convince Snyder to pay more than the market value for a home with a history of water intrusion. He noted that SPU and Boudreaux did not disclose the condition of the home on the disclosure statement or ask Verdin to fill one out. Nielsen said that Pilger "should have recognized that a disclosure statement signed by a middleman in a double escrow who had never lived in the house was a likely tool for working a fraud on Snyder." Moreover, Pilger misrepresented debits and credits on Verdin's settlement statement to hide the double escrow. Pilger included not only a sales price of $130,000 but also a "loan" of $29,510 to justify a "payment" by SPU of $160,036, the amount Snyder paid in her purchase from Boudreaux.

¶31.    Snyder also attached an affidavit from Michelle Avery, a CPA who confirmed the double escrow and Pilger's use of the funds from Snyder's purchase to pay for SPU's purchase of the property from Verdin. She based her opinion on the two settlement sheets and the wire transfers from the Verdin-SPU sale and the SPU-Snyder sale. Avery stated that a disbursement statement, time-stamped at 10:29 a.m., reflected that SPU wired $159,321 to Gulf Coast Bank to an account owned by Sovereign Title. These funds were for the purchase of the Verdin property ($130,000) and the loan ($29,510.56). The wire transfer was described as "Sharlene Verdin - Proceeds for the sale of 15190 Government Street." The other disbursement statement, time-stamped at 10:47 a.m., reflected that $123,931.81 was wired by Amerifirst to Pilger Title Company to fund the Snyder purchase. Avery said these

17

documents confirmed that SPU used the Snyder purchase proceeds to fund its purchase of the property from Verdin.

¶32.    On March 3, 2023, Snyder filed  responses to Boudreaux's and Pilger's motions to dismiss or for summary judgment.  She attached an appraisal prepared by Karen Lorona for "Rushing and Guise," Snyder's attorneys.  Lorona retroactively valued the property as of November 26, 2021, at $142,000, taking into account the water intrusion issues that Snyder described.  Lorona noted the following:

> Using the extra-ordinary assumption that the subject floods during heavy rain, all comparables require a condition adjustment for cost to cure.  Approx $4,600 concrete fill in for sunken floor costs were from contractor's estimates for the two front rooms.  The owner said the main bedroom closet floods which does not have a sunken floor.  Therefore, I am using an extra-ordinary assumption that the yard in the back of the closet needs better drainage.  A cost of $1,500 was used for a french drain to be installed.[17]

¶33.    Boudreaux and SPU filed a motion to strike Snyder's experts, arguing that the expert opinions were prejudicial, outside the parameters of the court's order allowing Rule 56(f) depositions when both they and Pilger initially filed their motions, and irrelevant to the issues raised in those motions.

¶34.    Pilger replied to Snyder's response on March 16, 2023.  They argued that Snyder failed to provide any statutory or caselaw precedent to support the duties they claimed Pilger owed. It was undisputed, they contended, that Pilger had no attorney-client relationship with

---

[17]  Snyder testified that she had not taken any steps to determine the cost of repairs needed.  Thus, the appraiser's overall estimate of $6,100 is the only evidence in the record of what that repair might cost.  In addition, Lorona noted that the yard appeared to have some drains installed, and "at the time of the inspection there was no dampness in the yard or in the home."

Snyder. Yet Snyder relied on the "inadmissible and speculative" and fundamentally flawed opinions of her experts, which assume, without evidence, that Pilger was Snyder's attorney. Pilger asserted that the only duty he owed in his role as the closing agent was "to ensure that the transactions closed in accordance with the terms of the contract." Further, the Pilger defendants asserted that the opinions of Snyder's experts were not relevant, reliable, or admissible and could not be used to support a denial of summary judgment.[18]

¶35.    Snyder responded to Boudreaux's motion to strike her experts and argued that she was required to present expert testimony to support her legal malpractice claim.

*Hearing on Motions to Dismiss and for Summary Judgment*

¶36.    The court heard arguments on the motions to dismiss and for summary judgment on April 7, 2023. During the hearing, Snyder withdrew her claims of conspiracy against Pilger, Boudreaux, and SPU. She also withdrew her claim for constructive fraud, and the court also dismissed the breach of contract claims. Then Boudreaux and SPU argued their motion, after which Pilger addressed the court.

¶37.    Pilger argued that Snyder testified in her deposition that Pilger was not her lawyer at the closing. Snyder's attorney, however, responded that Snyder's appearance at the closing established that Pilger was providing a service for her, and thus, he became her attorney. Although Snyder's counsel could cite no statute or caselaw to support this position, he argued that his expert, Cooper, held such an opinion. However, Snyder conceded that if Pilger were found not to be her lawyer, then Pilger had no duty to disclose the double escrow. The court

_____

[18] Pilger cited several out-of-state cases where courts had rejected Nielsen's opinions, attaching copies of several published opinions as a composite exhibit.

19

pressed Snyder's attorney for case law or statutory law that held Pilger to be the attorney for both Snyder and Boudreaux or that required Pilger to disclose everything he knew about each party to the other to get a waiver or a non-representation agreement signed. Snyder offered no law, and the court found Snyder also could not establish any damage she suffered by not being told about the double escrow. Because Snyder had testified that she thought she was purchasing the house from Verdin, the judge wondered why Snyder should care if Verdin eventually was paid from the money in her transaction. The court saw no damage caused to Snyder, who had bid higher than the asking price at her own agent's recommendation.

¶38. The court ruled that a genuine issue of material fact was in dispute as to what misrepresentations, if any, Boudreaux made to the Snyders when they visited the home. Thus, the court denied Boudreaux's motion to dismiss or for summary judgment. However, the court found there was no genuine issue of material fact as to Pilger. There was no evidence to support that Pilger acted as Snyder's attorney except as to the preparation of the deed. Moreover, Snyder read and signed the non-representation agreement. The court found no law making a double escrow illegal. Although Boudreaux made a profit, the court stated that no one forced Snyder to purchase the home at the price she agreed to. The court found the expert affidavits, which failed to cite any authority to support their opinions, to be irrelevant, and granted Pilger's motion to dismiss or for summary judgment. The court also found that Marlene and Victoria had no standing because they were not parties to the transactions. The court stated that it would allow briefing on Pilger's request for attorney's fees.

*Pilger's Motion for Attorney's Fees*

¶39.   On May 4, 2023, Pilger filed a motion for attorney's fees and costs pursuant to Rule 11 of the Mississippi Rules of Civil Procedure and the Litigation Accountability Act (LLA), Miss. Code Ann. §§ 11-55-1 to -15 (Rev. 2019).  They later supplemented their motion, attaching hearing and deposition excerpts and affidavits of time records.

*Orders and Judgments*

¶40.   The court issued  written orders and judgments on Boudreaux/SPU's and Pilger's motions to dismiss or for summary judgment on March 15, 2024.  The court entered a thirty-two-page detailed summary judgment in Pilger's favor and included language that there was no just reason for delay and that the judgment was final as to claims against Pilger and Pilger Title Company.

¶41.   The court also entered an order granting Pilger attorney's fees after finding that Snyder's claims against Pilger had no hope of success and were frivolous.  Moreover, Snyder waited until discovery had been undertaken and motions filed to claim that her case was one of first impression and that she was trying to extend existing law.  The court pointed out that the LLA requires that such a purpose be stated at the time of filing, not after the defendant raises its defense.  *See* Miss. Code Ann. § 11-55-7(g) (Rev. 2019).  Further, the court was concerned that Snyder filed her complaint before she even moved into the house and over five months before she personally experienced any water intrusion.  At the time she filed the suit, the court found "nothing whatsoever" to support her claims.  In addition, the court found that Marlene and Victoria never had any valid claim and that their claims in the complaint

were "wholly frivolous." The court considered the eleven factors listed in the LLA for determining whether a case was brought frivolously and determined, among other things, that Snyder had not properly investigated the case prior to filing suit, nor had she sought to reduce the number of claims after suit was filed.[19] The court ordered Snyder and her attorneys to

---

[19] These factors are found in Miss. Code Ann. § 11-55-7 (Rev. 2019):

In determining the amount of an award of costs or attorney's fees, the court shall exercise its sound discretion. When granting an award of costs and attorney's fees, the court shall specifically set forth the reasons for such award and shall consider the following factors, among others, in determining whether to assess attorney's fees and costs and the amount to be assessed:

(a) The extent to which any effort was made to determine the validity of any action, claim or defense before it was asserted, and the time remaining within which the claim or defense could be filed;
(b) The extent of any effort made after the commencement of an action to reduce the number of claims being asserted or to dismiss claims that have been found not to be valid;
(c) The availability of facts to assist in determining the validity of an action, claim or defense;
(d) Whether or not the action was prosecuted or defended, in whole or in part, in bad faith or for improper purpose;
(e) Whether or not issues of fact, determinative of the validity of a party's claim or defense, were reasonably in conflict;
(f) The extent to which the party prevailed with respect to the amount of and number of claims or defenses in controversy;
(g) The extent to which any action, claim or defense was asserted by an attorney or party in a good faith attempt to establish a new theory of law in the state, which purpose was made known to the court at the time of filing;
(h) The amount or conditions of any offer of judgment or settlement in relation to the amount or conditions of the ultimate relief granted by the court;
(i) The extent to which a reasonable effort was made to determine prior to the time of filing of an action or claim that all parties sued or joined were proper parties owing a legally defined duty to any party or parties asserting the claim or action;
(j) The extent of any effort made after the commencement of an action

pay Pilger and Pilger Title Company $80,253.00 for the services of their attorneys at Deutsch Kerrigan and $25,174.50 for the services of their attorney Taylor A. Pilger.

*Appeal and Motion*

¶42.   On April 12, 2024, Snyder appealed from the judgment granting Pilger's motion for summary judgment and the order awarding Pilger attorney's fees.  On appeal, she argues that Pilger had a duty to disclose critical information to her, either as her attorney or under the fiduciary duty he had because was the only attorney at the closing.[20]  Pilger responds that he was never Snyder's attorney, nor did he have any duty to disclose the information he had or should have had concerning the water intrusion issues with the home or the double escrow. However, before we discuss the issues on appeal, we first address a motion that Pilger has filed.

**Motion to Dismiss Appeal of Sanctions Order as Moot**

¶43.   Although Snyder appealed the circuit court's sanctions order awarding Pilger attorney's fees, she stated in her initial brief, filed on November 26, 2024, that "attorneys fees is not an issue on appeal," and she presented no argument about it.  Yet in her February 12, 2025 brief in reply to Pilger's responsive brief, Snyder argued that the court's award of attorney's fees was not supported by the evidence.  However, a day later, on February 13, 2025, attorneys from Preferred Professional Insurance Company sent Pilger's attorney two

---

to reduce the number of parties in the action; and
(k) The period of time available to the attorney for the party asserting any defense before such defense was interposed.

[20]   Marlene and Victoria Snyder do not argue on appeal that the court's dismissal of their claims for lack of standing was erroneous.

checks totaling $108,853.89 as satisfaction of the attorney's fee award. On March 10, 2025, the Pilger defendants filed a "Satisfaction of Judgment" of the attorney's fee order in the circuit court. Based on these events, Pilger filed a motion to dismiss the appeal of the attorney's fees order pursuant to Rule 27 of the Mississippi Rules of Appellate Procedure, attaching copies of the payment correspondence and the satisfaction of judgment. Although Snyder had seven days to respond to Pilger's motion to dismiss the appeal of the attorney's fees issue pursuant to Rule 27(a), no response was filed.

¶44. In the motion, Pilger argues that because Snyder has voluntarily paid the attorney's fees owed, the issue is now moot, and the appeal from that order should be dismissed. We agree. The Mississippi Supreme Court has held that the appellate court "cannot entertain an appeal where there is no actual controversy. If an appeal involves questions about rights which no longer exist, the appeal will be dismissed." *In re City of Biloxi*, 113 So. 3d 565, 572 (¶22) (Miss. 2013). In that case, a landowner, Frisby, had filed suit to be annexed into the City. *Id.* at 567 (¶2). Harrison County filed an answer as an interested party and objected. *Id*. After several continuances, Frisby filed a motion to voluntarily dismiss the case without prejudice, which the circuit court granted. *Id*. at (¶¶4, 6). However, the court conditioned any re-filing of the case "by or on behalf of Frisby" on Frisby's paying, among other things, $20,384 to Harrison County for its attorney's fees. *Id*. at 568 (¶6). Two years later, in a separate action, Gulfport began annexing a portion of Frisby's land. *Id*. at (¶7). Harrison County opposed and asked that the court enforce the previous order against Frisby

and make him pay the attorney's fee since the petition had been re-filed.[21]  *Id.*  Harrison

County enrolled the judgments and moved for an examination of Frisby as a judgment debtor.

*Id.* at (¶9).  Frisby filed a motion for relief from judgment, *see* M.R.C.P 60(b), as well as a

response to the motion for the examination of a judgment debtor.  *In re City of Biloxi*, 113

So. 3d at 569 (¶9).  The special chancellor denied Frisby relief, and Frisby appealed.  *Id.* at

(¶10).  Thereafter, Frisby paid Harrison County the attorney's fee in dispute yet proceeded

with the appeal.  *Id.*  On the issue of mootness, the Mississippi Supreme Court stated:

> We repeatedly have held that cases in which an actual controversy existed at
> trial but the controversy has expired at the time of review, become moot. Thus,
> standing must exist when litigation is commenced and must continue through
> all subsequent stages of litigation, or the case will become moot. Cases that
> have become moot will be dismissed, because the Court does not adjudicate
> moot questions.

*Id.* at 572 (¶20) (citations and internal quotation marks omitted).  The Court stated that it

could not entertain an appeal where there was no longer any controversy, and in instances

where the question of a party's rights no longer exists, the appeal should be dismissed.  *Id.*

at (¶22).  Citing *Rhodes v. Rhodes*, 336 So. 2d 1315, 1316 (Miss. 1976), the Court noted that

it had previously dismissed an appeal when a fee ordered by a chancellor was paid between

the time the judgment was announced and when it was entered, stating that "the error, if any,

in the chancellor's holding has become moot and decision by this Court would be an exercise

in academics."  *Id.*  The Court concluded that when Harrison County accepted payment of

---

[21]  Harrison County ultimately filed a motion in the first case to have the previous order concerning the payment of fees on refiling reduced to a final judgment.  *In re City of Biloxi*, 113 So. 3d at 568 (¶7).  A special chancellor appointed to handle that case denied Harrison County's motion, holding that the original order was already a final judgment.  *Id.* at 569 (¶8).

the amount owed, there was nothing more to be determined; thus, the appeal was dismissed as moot. *Id*.

¶45. The Supreme Court reiterated this principle in *Gamma Healthcare Inc. v. Estate of Grantham*, 334 So. 3d 85, 87 (¶2) (Miss. 2022), stating:

> Cases in which an actual controversy existed at trial but the controversy has expired at the time of review, become moot. We have held that the review procedure should not be allowed for the purpose of settling abstract or academic questions, and that we have no power to issue advisory opinions.

There is an exception to the mootness doctrine when the question involves a matter affecting public interest. *In re Validation of Tax Anticipation Note*, *Series 2014*, 187 So. 3d 1025, 1033 (¶22) (Miss. 2016). "[T]his exception arises 'when the question concerns a matter of such a nature that it would be distinctly detrimental to the public interest that there should be a failure by the dismissal to declare and enforce a rule for future conduct.'" *Id*. (quoting *Sartin v. Barlow*, 196 Miss. 159, 16 So. 2d 372, 376 (1944).

¶46. In the case at hand, although Snyder appealed the attorney's fee order, she then paid the amount ordered in the judgment. Pilger filed a satisfaction of the judgment, and Snyder had not opposed Pilger's motion to dismiss the appeal of that issue as moot. The issue of Pilger's entitlement to attorney's fees, which does not affect the public interest, no longer exists. Accordingly, Pilger's motion to dismiss the appeal of the order on the issue of the circuit court attorney's fees is granted.

## Standard of Review

¶47. When a trial court grants or denies summary judgment, appellate courts apply a de novo standard of review. *Nat'l Collegiate Athletic Ass'n v. Farrar*, 402 So. 3d 1251, 1257

26

(¶15) (Miss. 2024). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Miss. Hub LLC v. Baldwin*, 358 So. 3d 305, 307 (¶6) (Miss. 2023) (quoting M.R.C.P. 56(c)).

## Discussion

### I. Whether the circuit court erred in granting summary judgment to Pilger on Snyder's legal malpractice claim.

¶48. In her complaint, Snyder alleged a claim of negligence and legal malpractice against Pilger, pleading:

> At all times mentioned herein, Pilger was negligent in the handling of the closing transaction and did not handle the closing transaction according to the standard of care that existed then and there in the community and did not handle the transaction in a manner as is consistent with agents of title companies and closing attorneys.

¶49. There are two types of legal malpractice actions: (1) an attorney's breach of the standard of care, i.e., the exercise of the knowledge, skill, and ability ordinarily possessed and exercised by member of the legal profession similarly situated, *Thompson v. Erving's Hatcheries Inc.*, 186 So. 2d 756, 758 (Miss. 1966), and (2) an attorney's breach of fiduciary obligations to his client, i.e. the duty of loyalty or disclosure, known as the standard of conduct. *Lane v. Oustalet*, 873 So. 2d 92, 98 (¶27) (Miss. 2004).[22] "To prevail on a claim for legal malpractice based on an allegation of negligence, or breach of the standard of care,

---

[22] *See also Baker Donelson Bearman Caldwell & Berkowitz P.C. v. Seay*, 42 So. 3d 474, 486 (¶34) (Miss. 2010) ("An attorney-client relationship imposes the following duties, (a) the duty of care, (b) the duty of loyalty, and (c) duties provided by contract.").

27

one must prove by a preponderance of the evidence (1) an attorney-client relationship; (2) the attorney's negligence in handling [a] client's affairs; and (3) proximate cause of the injury." *McGilberry v. Ross*, 358 So. 3d 340, 345-46 (¶16) (Miss. Ct. App. 2022). In the other category,

> [w]hen a legal-malpractice claim is based on an allegation of breach of fiduciary duty, the plaintiff must establish (1) the existence of an attorney-client relationship; (2) the acts constituting a violation of the attorney's fiduciary duty; (3) that the breach proximately caused the injury; and (4) the fact and extent of the injury.

*Id.* at 349 (¶29) (citing *Est. of St. Martin v. Hixon*, 145 So. 3d 1124, 1129 (¶12) (Miss. 2014).

¶50.     The threshold requirement in either type of legal malpractice case is the existence of an attorney-client relationship, which the client must prove by a preponderance of the evidence, *Baker Donelson Bearman & Caldwell P.C. v. Muirhead*, 920 So. 2d 440, 449 (¶33) (Miss. 2006), and the absence of such a relationship is fatal. *Gibson v. Williams, Williams & Montgomery PA.*, 186 So. 3d 836, 848 (¶34) (Miss. 2016) (citing *Great Am. E&S Ins. Co. v. Quintairos, Prieto, Wood & Boyer P.A.*, 100 So. 3d 420, 425 (¶24) (Miss. 2012)).[23] A relationship between a lawyer and client arises when:

> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either:
>
> (a) the lawyer manifests to the person the consent to do so; or
>
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer

---

[23] An exception is in title-work cases, where the Mississippi Supreme Court has held that "liability may be extended to 'foreseeable third parties who detrimentally rely' on the attorney's negligent conduct." *Great Am. E&S Ins. Co.*, 100 So. 3d at 424-25 (¶21). There, the Court stated an attorney engaged to perform title work is expected by the client to protect not only the client, but also those who later rely on the attorney's opinion. *Id.* at 425 (¶22).

reasonably knows or should know that the person reasonably relies on the lawyer to provide services . . . .

*Pettis v. Simrall*, 354 So. 3d 295, 300 (¶14) (Miss. 2023); *Gibson*, 186 So. 3d at 848 (¶35); *Singleton v. Stegall*, 580 So. 2d 1242, 1244 n.2 (Miss. 1991). For example, the Mississippi Supreme Court has found that an excess-coverage carrier did not have an attorney-client relationship with the attorneys hired by the primary carrier just because the attorneys gave updated case-status reports and settlement values of a case to both carriers. *Great American E&S Ins. Co.*, 100 So. 3d at 424 (¶18). However, in another case, the Court found that an estate's attorney signing a pleading as "counsel for the petitioner" indicated to the petitioner who later sued him for legal malpractice that the attorney was representing him, and indicated to the court that the attorney was representing the petitioner. *Gibson*, 186 So. 3d at 849 (¶39). In *Gibson*, the Court found that under these circumstances, there was a genuine issue of material fact concerning the existence of an attorney-client relationship between the petitioner and the estate's attorney, precluding summary judgment. *Id*. at 850 (¶42).

¶51.     *Grandquest v. Estate of McFarland*, 18 So. 3d 324 (Miss. Ct. App. 2009), is relevant to the case at hand. There, Williams mortgaged his property in 2001, naming attorney Robertson as the trustee. *Id*. at 326 (¶3). Before paying off the mortgage, Williams contracted to sell the property to Grandquest and told Grandquest that her attorney, Robertson, would do the closing and take care of the paperwork. *Id.* Williams had Robertson prepare the warranty deed to Grandquest and an authority to cancel the deed of trust. *Id.* at (¶4). These documents were signed on September 13, 2002, at Robertson's office, but the cancellation of the deed of trust was never filed. *Id*. at (¶¶5-6). On May 12,

29

2003, Robertson foreclosed on the mortgage. *Id.* at (¶6). Grandquest sued Robertson for fraud and legal malpractice. *Id*. at 325 (¶1). Finding no evidence of fraud or the existence of an attorney-client relationship between Robertson and Grandquest, the circuit court granted Robertson summary judgment. *Id*. at 326 (¶8). On appeal, we affirmed the circuit court's holding that the evidence was insufficient to establish an attorney-client relationship between Grandquest and Robertson. *Id*. at 327 (¶12). We noted that Grandquest did not select Robertson to perform the closing; she did not direct him in preparing documents. *Id*. She had not requested or received any legal advice from Robertson or his staff, and the $57.50 she paid to Robertson for document preparation was paid as part of the sales agreement. *Id.* Accordingly, we found that the circuit court did not err in finding the evidence insufficient to establish an attorney-client relationship. *Id.*

¶52. Here, Snyder argues that an attorney-client relationship with Pilger was formed because she paid him for his services. But Snyder signed no retainer agreement or contract with Pilger for his work from which an attorney-client relationship arose. Snyder only "paid" Pilger because under the sales contract, she was required to pay the closing costs, which included Pilger's cost. She did nothing else to manifest her intent that Pilger represent her at the closing. To the contrary, she testified that she was not claiming that Pilger was her attorney. The two never met or spoke. Moreover, Pilger was selected to be the closing attorney by both Boudreaux and Burke, who was Snyder's real estate agent. Pilger could not represent one over the other, a fact he memorialized in the non-representation acknowledgement that Snyder said she signed with the understanding that Pilger was not her

30

attorney. Thus, Pilger had manifested his intent *not* to be her attorney or Boudreaux's attorney in the transaction.

¶53. Snyder contends her expert's opinion that there was an attorney-client relationship between her and Pilger precluded summary judgment and that the chancery court erroneously struck Cooper's opinion. However, Cooper ignored Snyder's own testimony that she did not consider Pilger to be her attorney. "The trial court, as a part of its gatekeeping role, must consider the reliability of the foundational facts upon which an expert bases an opinion. The sufficiency of this information is a question of law." *Roncali v. State*, 412 So. 3d 1235, 1244 (¶44) (Miss. Ct. App. 2025), *reh'g denied* (Miss. Ct. App. July 22, 2025), *petition for cert. filed* (Miss. July 29, 2025). The circuit court correctly found that Cooper failed to provide adequate legal authority for his opinion by only partially quoting K.F. Boackle's treatise, *Mississippi Real Estate Contracts and Closings*.[24] In addition, Cooper claimed that Pilger violated the Mississippi Rules of Professional Conduct; however, as the circuit court noted, the Preamble to the Rules explicitly states that violations of a rule should not give rise to a cause of action or create any presumption that a legal duty has been breached. "The admission or exclusion of expert testimony falls within the sound discretion of the trial court and will only be reversed if the decision was arbitrary or clearly erroneous." *Erves v. Hosemann*, 335 So. 3d 603, 609 (¶8) (Miss. Ct. App. 2022). We find the circuit court did not arbitrarily or erroneously hold that Cooper's opinion did not create a dispute of fact as to

---

[24] Cooper stated that, according to Boackle, a closing attorney represented both parties. Cooper failed to fully cite Boackle, who also stated that a closing attorney could and should make his non-representation of either party clear through a disclosure, which Pilger did in this case. *See infra* ¶64.

whether an attorney-client relationship existed between Pilger and Snyder.

¶54. In summary, the circuit court did not err in finding no material facts in genuine dispute and holding that Snyder and Pilger had no attorney-client relationship. Without proof of the existence of an attorney-client relationship, an essential element of either type of legal malpractice claim, Pilger was entitled to summary judgment.

## II. Whether the circuit court erred in finding that Pilger owed no other fiduciary duty to Snyder.

¶55. Separate from the negligence-based argument, Snyder also claims that Pilger owed her a fiduciary duty that he breached. We disagree.

*Lack of Proof that Pilger and Snyder had a Fiduciary Relationship*

¶56. "It is axiomatic that a fiduciary duty must exist before a breach of the duty can occur." *Gibson*, 186 So. 3d at 851 (¶50) (internal quotation marks omitted). "A 'fiduciary relationship' is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another." *Burgess v. BankPlus*, 830 So. 2d 1223, 1227 (¶7) (Miss. 2002) (citing *Lowery v. Guar. Bank & Trust Co.*, 592 So. 2d 79, 83 (Miss. 1991)). A fiduciary relationship "may arise in a legal, moral, domestic, or personal context, where there appears 'on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." *Id.* In such situations, "a 'fiduciary' is 'required to act for the benefit of another person on all matters within the scope of their relationship,' owing 'the duties of good faith, trust, confidence, and candor.'" *In re Jones ex rel. Taylor*, 411 So. 3d 1169, 1173 (¶24) (Miss. Ct. App. 2025) (quoting *Wilbourn v. Wilbourn*, 106 So. 3d 360, 371 (¶35) (Miss. Ct. App. 2012)).

32

¶57. A fiduciary relationship "need not be created by contract[;] it may arise from an informal relationship where both parties understand that a special trust and confidence has been reposed." *Burgess*, 830 So. 2d at 1227 (¶7). The Mississippi Supreme Court has recognized that in certain circumstances, attorneys can acquire fiduciary duties owed to persons who are not their clients and with whom no attorney-client relationship exists.

> In Mississippi, a fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears 'on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed.' So fiduciaries' duties may arise as a matter of law from certain specified relationships such as attorney and client; or they may be created by the facts and circumstances of a particular relationship, taking into account the above factors.

*Gibson*, 186 So. 3d at 851 (¶51) (citations and internal quotation marks omitted).

¶58. An example of an attorney who had an attorney-client relationship at one time, and a fiduciary relationship at other times, is found in *Lowrey v. Will of Smith*, 543 So. 2d 1155 (Miss. 1989). There, Lowrey, an attorney, and his wife had befriended David and Lois Smith while Lowrey was in law school. *Id.* at 1156. They had remained in touch after law school, and Lowrey performed some legal services for the Smiths. *Id.* David developed Alzheimer's disease, and Lois asked Lowrey to take care of them if something should happen to them. *Id.* Lowrey suggested a conservatorship, but Lois decided against that idea. *Id.* Instead, she added Lowrey to her and her husband's joint checking account, telling Lowrey that if they should die, Lowrey could have whatever was left in the account after paying their final expenses. *Id.* After David and then Lois died, Lowrey had access to the Smiths' joint checking account, which had approximately $12,000 in it, and put the account solely in his

name. *Id*. Although he paid the funeral and medical bills, Lowrey made two withdrawals of $7,000 and $4,700, which he deposited into his own account for his personal use. *Id*. In later litigation over the account, the chancery court distinguished Lowrey's formal attorney-client actions from his actions in withdrawing funds from the Smiths' joint account. *Id*. at 1161. The Mississippi Supreme Court agreed with the chancery court that Lowrey's actions concerning the bank account were not part of a legal service Lowrey provided, but, rather, it was part of Lowrey's fiduciary relationship with the Smiths. The Court agreed with the chancery court, which stated:

> A fiduciary relationship can exist between anyone. You don't have to be a professional. It's a relationship in which confidence is reposed by one party and influence which naturally grows out of such confidence is possessed by the other. Not only does the dominant party wield influence, but that party is also in a position of superiority. You have two parties, a dominant or superior party, and an inferior party. The superior party has influence. The inferior party is influenced by the superior party. The relationship and the duties involved in that relationship are not necessarily legal. They may be moral, they may be social, they may be domestic, or, they may be merely personal.

*Id*. at 1161.

¶59. In *Gibson*, 186 So. 3d at 852 (¶¶52-54), the Mississippi Supreme Court also held that an estate attorney may owe a fiduciary duty to non-clients. In that case, the attorney representing the estate summoned family members to his office and stated that the deceased's surviving husband, Bobby, "was the only 'interested party' who had not signed the combined 'probate proceeding petition' and that, if he signed the combined petition, he would receive 'big money,' but if he did not sign, the estate would sell certain guns which had sentimental value to Bobby." *Id.* at 841 (¶6). The attorney made other misrepresentations that caused

Bobby to sign the petition. *Id.* When the chancery court denied Bobby's later petition to reopen the estate, Bobby appealed, and the Supreme Court stated:

> An attorney for the estate may, under certain circumstances, owe fiduciary duties to a beneficiary of the estate based on the same considerations relevant to determine fiduciary duties to all third parties. The existence of these fiduciary relationships are questions to be determined in the trial court, and here, we believe sufficient evidence exists in the record for a factfinder to conclude that Montgomery [the attorney for the estate] owed Bobby [the deceased's spouse] fiduciary duties, even without a finding of an attorney-client relationship.

*Id.* at 852 (¶53).

¶60. At issue in this case is whether Pilger, who never performed any legal services for Snyder, never had an attorney-client relationship with Snyder, and never even met with her personally, owed her any fiduciary duty. Undisputedly, Pilger acted as the closing attorney, scrivener of documents, and processor of funds. Snyder presented no facts that would establish Pilger's "overmastering influence" over a weak or dependent Snyder. Nor did Snyder testify to placing any special trust or reliance in Pilger for anything other than closing on the transactions. The facts simply do not establish a fiduciary relationship between Pilger and Snyder from which a fiduciary duty would arise.

*Lack of Proof that Pilger was Snyder's Agent*

¶61. In the alternative, Snyder also contends that Pilger was her agent, that an agent owes a duty to the principal to disclose information, and that Pilger failed to disclose his alleged knowledge of water issues with the home and the double escrow. "The burden of proving an agency relationship rests squarely upon the party asserting it." *Diversicare of Meridian LLC v. Shelton*, 334 So. 3d 487, 495-96 (¶24) (Miss. Ct. App. 2022). "An express agency

35

is generally based on an oral or written agreement between the principal and the agent." *Id*. (citing Jeffrey Jackson, Mary Miller & Donald Campbell, *Encyclopedia of Mississippi Law*, § 4.4 (updated Oct. 2021)). "An express agent is one who is 'in fact authorized by the principal to act on their behalf.'" *Id*. (citing *Forest Hill Nursing Ctr. Inc. v. McFarland*, 995 So. 2d 775, 781 (¶13) (Miss. Ct. App. 2005)). Alternatively, "[t]o prove that an implied agency existed, the evidence must show that the principal expressly gave the alleged agent the authority to perform acts on his behalf, which would reasonably lead a third party to believe that an agency relationship existed." *Monticello Cmty. Care Ctr. LLC v. Est. of Martin ex rel. Peyton*, 17 So. 3d 172, 178 (¶19) (Miss. Ct. App. 2009).

¶62. In the case at hand, Snyder neither signed nor orally contracted with Pilger to act on her behalf. Nor did she act in any manner that suggested Pilger was her agent and not Boudreaux's. To the contrary, at the time of the closing, she signed a non-representation statement saying that Pilger was not her attorney and did not represent her in this transaction. These actions show she was not giving Pilger authority to act for her, and no reasonable third party would be led to believe he was her agent.

¶63. Snyder cites a South Dakota case, *American State Bank v. Adkins*, 458 N.W. 2d 807 (S.D. 1990), as authority that Pilger was her agent because the funds for the sales were placed in escrow accounts, allegedly imposing on Pilger a fiduciary duty to disclose any fraud. However, not only is *Adkins* not binding on this Court, it is factually inapplicable and ultimately does not support Snyder's position. In that case, the Adkins and Deam Investments, who was purchasing a subsidiary corporation, Central Acceptance, that the

36

Adkins owned, executed a separate escrow agreement in which both authorized the bank "to keep and preserve the certificates evidencing the shares of Central in its possession as security for payment of the note." *Id.* at 808. The Adkins deposited certificates evidencing 458 shares of the subsidiary with bank as an escrow agent. *Id.* Thereafter, unbeknownst to the Adkins, a subsidiary of the bank and Deam Investments engaged in the exchange of stock in two corporations, one of which related to the Adkins/Deam corporation sale. *Id.* When Deam Investments defaulted on its obligation to the Adkins, the bank filed for a declaratory judgment over the ownership of the shares held in escrow, and the Adkins counterclaimed against the bank for breach of fiduciary duty. *Id.* Although the Adkins were declared to be the owners of the shares, the trial court granted the bank's motion for summary judgment on Adkins's counterclaim. *Id.* On appeal, however, the South Dakota Supreme Court held that the bank, as the escrow agent, was the agent and fiduciary of all parties to the escrow agreement. *Id.* at 810.

¶64.    The facts of our case are clearly distinguishable from those in *Adkins*. In *Adkins*, under the escrow agreement, the Bank had duties to both parties of the agreement. In Snyder's case, however, there was no "escrow agreement" under which Pilger represented both parties. In fact, as stated repeatedly, Pilger told both parties that he was not representing either of them. In *Mississippi Real Estate Contracts and Closings*, K.F. Boackle identifies the limited duties of a closing attorney who has clarified with the parties that he does not represent either of them individually, stating

> The closing attorney deals with money belonging to other people, and must
> insure proper application of that money. The attorney deals with title to real

37

estate and must insure that the seller conveys only what he is supposed to convey, that the purchaser acquires good title to everything he is supposed to acquire, and that a lender's title is also good.

K.F. Boackle, *Mississippi Real Estate Contracts & Closings*, §4-2 (2d ed. 2002). Boackle notes the potential conflict of interest a closing attorney may face because the interests of the buyer and the interests of the seller are different. *Id*. at § 4-2.1. To resolve this, Boackle states:

> The parties to a real estate transaction are engaged in an arm's length proceeding, and from the very nature of the transaction, the lawyer for one cannot properly represent the other. *A representation disclosure statement should be sent to the parties as soon as their identity and addresses are known.*

*Id*. at § 4-3 (emphasis added). Here, Pilger performed the limited duties he was charged to complete—prepare the title work and deeds, and ensure the money agreed upon was paid. In addition, he did exactly as Boackle suggests—he had the parties sign an acknowledgment that he was not representing either of them and that they could retain their own attorneys if they desired.

### *Lack of Proof of Pilger's Knowledge*

#### *Water Intrusion*

¶65. Even if Pilger had some fiduciary duty of disclosure, it would only extend to information Pilger had. But Snyder presented no proof that, at the time of the closing on the home in 2021, Pilger knew that the home had water intrusion issues. We agree with the chancery court that nothing in the record establishes that Pilger, who had closed on the property nearly five years earlier and on thousands of others since, had any knowledge that there were water intrusion issues in 2021. Nor did Snyder present proof that Pilger knew of

water intrusion issues in 2017 that he intentionally withheld in 2021.

*Double Escrow*

¶66.     Snyder also has not presented any legal precedent for requiring the disclosure of the double escrow.  Despite Snyder's adamant argument, *Memphis Hardwood Flooring Co. v. Daniel*, 771 So 2d 924 (Miss. 2000), is not applicable to the facts of this case and does not require disclosure when property is sold twice on the same day unless it is part of a scheme to defraud a property seller.

¶67.     In *Memphis Hardwood*, Daniel, an eighty-five-year-old woman, contracted with Easley and Northern Hardwood to cut timber on her property that had been damaged by an ice storm.  *Id*. at 927 (¶¶6-7).  Later, Easley approached Daniel to cut more trees on her property, and she agreed, though she limited the cutting to certain parts of the property and only of timber over sixteen inches in diameter.  *Id*. at (¶7).  Easley told Daniel that Northern would again be the buyer of the timber, and she agreed to a sales price of $150,000.  *Id*. at 928 (¶12).  Thereafter, Easley contacted Memphis Hardwood and told them that he had an agreement to buy all of Daniel's timber.  *Id*. at 927-28 (¶8).  Memphis negotiated a price of $410,000 for the timber.  *Id*. at 928 (¶12).  Easley told Memphis that Daniel would first sell the timber to Northern and then Northern would immediately sell it to Memphis.  *Id*.  Easley presented a timber deed to Daniels, which she signed but did not read.  *Id*. at 929 (¶13).  It covered her full 800 acres of property and did not contain a non-assignment clause.  *Id*. Daniel gave the deed to Easley, who traveled to Memphis's office and signed a second deed conveying the timber on behalf of Northern to Memphis.  *Id*.  Memphis Hardwood gave

Easley a $400,000 check made out to Northern, and a $10,000 check made out to Easley personally. *Id.* Memphis cut timber on Daniel's property from January until April 1, 1996, when the chancery court entered an injunction. *Id.* at (¶14). The chancellor found a confidential relationship existed between Easley and Daniel and that Easley owed her fiduciary duties concerning the timber deeds. *Id.* at 929 (¶17). Even without the confidential relationship, the court found Easley guilty of fraud because Easley's payment to her was so grossly inadequate. *Id.* The court also found that Memphis Hardwood was not an innocent purchaser without notice and was aware of Easley's fraud. *Id.*

¶68. On appeal, the Mississippi Supreme Court affirmed the chancellor's finding that Easley had a fiduciary duty to Daniel based on Daniel's initial timber contract with Easley. *Id.* at 930 (¶21). Moreover, the evidence showed that Daniel had placed trust in Easley and that she was not willing for any other timber to be cut except under Easley's supervision. *Id.* The Court also stated that the evidence supported the chancellor's finding that the fraud on Daniel was a combined effort of Northern, Easley, and Memphis. *Id.* at 932 (¶25). The Court further noted that the $150,000 purchase price supported Daniel's contention that she did not intend to sell all of her timber. The gap, the court stated, between the $150,000 and $410,000 payments "shocks the conscience" and was further evidence of fraud. *Id.* at 932-33 (¶28).

¶69. It is readily apparent that the facts of the case at hand are distinguishable from those in *Memphis Hardwood*. Here, Pilger was not a party to either of the contracts between Verdin and Boudreaux or Boudreaux and Snyder, nor was he involved in the negotiations

40

leading up to their formation. There is no proof that Pilger had any information about the dealings between the parties other than the two sales contracts he was charged to close. As we have already held above, there is no proof of a confidential relationship between Snyder and Pilger such that he would owe her any fiduciary duty such as those Easley had. Nor did Snyder present any proof of collusion between or among Pilger, Boudreaux, and Verdin to defraud Snyder. Moreover, if there were any fraud comparable to that prohibited in *Memphis Hardwood*, the victim would have been Verdin, not Snyder, because Verdin, the seller, received only $130,000, when Boudreaux and SPU were paid $161,000. But even then, the discrepancy in the sales prices of the home in the two contracts was not great enough to be considered proof of fraud. Verdin wanted to sell and accepted $130,000. Snyder wanted to buy and, at her real estate agent's suggestion, offered first $156,000 and then $161,000 for a home appraised at $169,000 to $184,000. The difference in these figures does not shock the conscience.[25] Moreover, in *Memphis Hardwood*, Easley apparently prepared the timber deeds and intentionally prepared one for Daniels to sign that was different than their oral agreement. Here, Pilger prepared deeds that accurately reflected the parties' intent, and Snyder makes no claim that the deed he prepared was erroneous in any way.

¶70.    Significantly, the Court in *Memphis Hardwood* did not mention the same-day double "closing" as a factor in the defendants' fraudulent scheme. Despite Snyder's assertions, the Court did not hold that property cannot be sold twice in the same day or that closing attorneys

---

[25] Even Snyder's forensic appraisal valued the property at $142,000 because of water intrusion issues and noted that these could be repaired for $6,100. Presumably such a repair would restore the home to the appraised value set by Snyder's original appraiser.

have a duty to disclose resales of property that occur on the same day. The fact that Easley re-sold Daniel's timber the same day was of no significance; Easley would still have been guilty of the fraud and breach of fiduciary duty had the resale to Memphis Hardwood occurred a week later. Here, the circuit court was correct that there is no law prohibiting property from being sold twice in the same day and certainly none requiring a disclosure by the closing attorney of a double escrow without a showing of his or her complicity in a fraud.

## Conclusion

¶71. Because Snyder failed to prove she had an attorney-client relationship with Pilger, the circuit court did not err in dismissing her legal malpractice claim against him. Moreover, because Pilger had no confidential relationship with Snyder, nor was there any evidence that he was her express or implied agent, the circuit court did not err in finding that Pilger had not assumed or breached any special fiduciary duties owed to her. Further, because there is no legal prohibition from selling property twice in the same day or requirement that closing attorneys disclose a double escrow, Pilger had no obligation to disclose the Verdin-Boudreaux sale to Snyder. Accordingly, we affirm the circuit court's grant of summary judgment in favor of Pilger and Pilger Title Company. Additionally, because Snyder has paid the attorney's fees ordered by the circuit court, we grant Pilger's motion to dismiss the appeal of the attorney's fee order.

¶72. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, EMFINGER, WEDDLE AND LASSITER ST. PÉ, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

42